FILED_____ ENTERED
_____ LOGGED_____ RECEIVED

FEB 23 2017

LJW/DEH: USAO # 2016R00169

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **UNDER SEAL** |
| **v.** | |
| | Criminal No. _____ 17-0106 |
| **MOMODU BONDEVA KENTON GONDO,** a/k/a "GMoney" and "Mike,"| **(RICO Conspiracy, 18 U.S.C. § 1962(d); RICO, 18 U.S.C. § 1962(c); Aiding and** |
| **EVODIO CALLES HENDRIX,** | **Abetting, 18 U.S.C. § 2; Criminal Forfeiture, 21 U.S.C. § 853)** |
| **DANIEL THOMAS HERSL,** | |
| **WAYNE EARL JENKINS,** | |
| **JEMELL LAMAR RAYAM,** | |
| **MARCUS ROOSEVELT TAYLOR, and** | |
| **MAURICE KILPATRICK WARD,** | |
| **Defendants.** | |

## INDICTMENT

## COUNT ONE
### (RICO Conspiracy)

The Grand Jury for the District of Maryland charges that at all times relevant to this Indictment:

### THE ENTERPRISE

1.     The Baltimore Police Department ("BPD") was an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, with a population of more than 621,000. The BPD was the eighth largest municipal police force in the United States staffed by nearly 3,100 civilians and sworn personnel.

2. The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

3. The Gun Trace Task Force ("GTTF") was a specialized unit within the Operational Investigation Division of the BPD. The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

4. Sworn members of the BPD must abide by the Law Enforcement Officer's Code of Ethics, which provides, in pertinent part:

> As a Law Enforcement Officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice. I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department ... I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice ... I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession . . . law enforcement.

## PURPOSE OF THE ENTERPRISE

5. The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

## THE DEFENDANTS

6.    Detective MOMODU BONDEVA KENTON GONDO, a/k/a "GMoney" and "Mike," joined the BPD on November 29, 2005, and was assigned to the GTTF at all times relevant to this Indictment.

7.    Detective EVODIO CALLES HENDRIX joined the BPD on April 2, 2009, and was assigned to the GTTF on or about June 13, 2016.

8.    Detective DANIEL THOMAS HERSL joined the BPD on September 7, 1999, and was assigned to the GTTF not later than April 28, 2016.

9.    Sergeant WAYNE EARL JENKINS joined the BPD on February 20, 2003, and became the Officer in Charge of the GTTF on or about June 13, 2016.

10.    Detective JEMELL LAMAR RAYAM joined the BPD on July 12, 2005, and was assigned to the GTTF at all times relevant to this Indictment.

11.    Detective MARCUS ROOSEVELT TAYLOR joined the BPD on May 18, 2009, and was assigned to the GTTF on or about June 13, 2016.

12.    Detective MAURICE KILPATRICK WARD joined the BPD on October 8, 2003, and was assigned to the GTTF on or about June 13, 2016.

13.    In Fiscal Year 2016 (July 1, 2015 through June 30, 2016), the defendants earned the following in salary and overtime from their employment with the BPD:

| Defendant | Annual Salary | Overtime | Gross Pay |
|-----------|--------------|----------|-----------|
| JENKINS | $85,406 | $83,345.15 | $168,751.15 |
| GONDO | $71,412 | $29,162.09 | $100,574.09 |
| RAYAM | $71,412 | $30,834.47 | $102,246.47 |
| HERSL | $77,591 | $66,602.98 | $144,193.98 |
| HENDRIX | $69,373 | $52,428.68 | $121,801.68 |
| WARD | $72,775 | $62,493.09 | $135,268.09 |
| TAYLOR | $66,784 | $56,246.35 | $123,030.35 |

3

## PURPOSES OF THE DEFENDANTS

14.     The purposes of the defendants included violating the legitimate purposes of the

BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time

and attendance fraud.

## THE RACKETEERING CONSPIRACY

15.     Beginning at a date unknown to the Grand Jury, but at least by in or about 2015,

through on or about the date of this Indictment, in the District of Maryland and elsewhere, the

defendants,

**MOMODU BONDEVA KENTON GONDO,**
**a/k/a "GMoney" and "Mike,"**
**EVODIO CALLES HENDRIX,**
**DANIEL THOMAS HERSL,**
**WAYNE EARL JENKINS,**
**JEMELL LAMAR RAYAM,**
**MARCUS ROOSEVELT TAYLOR, and**
**MAURICE KILPATRICK WARD**

being persons employed by and associated with the BPD, an enterprise, which engaged in, and

the activities of which affected, interstate and foreign commerce, together with persons known

and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire,

confederate and agree to violate Section 1962(c) of Title 18, United States Code, that is, to

conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through

a pattern of racketeering activity, consisting of multiple acts indictable under:

a.   18 U.S.C. § 1343 (wire fraud);

and multiple acts involving:

a.   Robbery, chargeable under MD. CODE ANN., Crim. L. § 3-402 and Conspiracy,

chargeable under MD. CODE ANN., Crim. L.§ 1-203.

4

b.  Extortion by State or local Government Officer or Employee, chargeable under MD. CODE ANN., Crim. L. § 3-702 and Conspiracy, chargeable under MD. CODE ANN., Crim. L.§ 1-203.

## MEANS AND METHODS OF THE CONSPIRACY

16.  Among the means and methods by which the defendants and others pursued their illegal purposes were the following:

a.  detaining individuals and stealing money, property and narcotics from them;

b.  entering residences and stealing money, property and narcotics from the owners and occupants of those residences;

c.  conducting traffic stops of vehicles and stealing money, property and narcotics from the vehicle occupants;

d.  swearing out false affidavits to obtain search warrants in order to steal money, property and narcotics;

e.  preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees and charging documents to conceal the fact that the defendants stole money, property and narcotics from individuals;

f.  evading court proceedings involving arrestees from whom the defendants stole money, property and narcotics in order avoid questioning regarding the stolen money, property and narcotics; and

g.  obstructing and evading law enforcement efforts to uncover their criminal conduct, including,

i.  alerting one another to potential investigations into their criminal conduct,

    ii.  coaching one another to give false testimony to investigators from the Internal Investigations Division of the BPD,

    iii.  turning off their body cameras to avoid recording law enforcement encounters with civilians in which they were participants; and

h.  defrauding the BPD and the State of Maryland by submitting false and fraudulent time and attendance records in order to obtain salary and overtime payments for times when the defendants did not work.

## OVERT ACTS

17.    In furtherance of the conspiracy, the defendants committed the following overt acts in the District of Maryland and elsewhere:

### May 11, 2016, Robbery / Extortion of N.D.

18.    On May 9, 2016, at approximately 2:21 p.m., GONDO placed a telephone call to a confidential informant (CI-1). The two discussed setting up a meeting between CI-1 and an individual, N.D. On this call, GONDO and CI-1 discussed CI-1 obtaining opioids to sell to N.D. and GONDO told CI-1 to "set him up" referring to N.D. and to "make sure" that N.D. had a gun on him at the time of the sale.

19.    Later in the day on May 9, 2016, GONDO received an incoming telephone call from CI-1. During the call the CI-1 told GONDO that, "[t]hey gonna have like, uhh, seven hundred dollars on them, he gonna have a 22 [a .22 caliber handgun], and he gonna bring me something. Him and his girlfriend."

20.    On May 11, 2016, Detectives GONDO, RAYAM and HERSL, acting in their capacity as police officers, conducted a traffic stop of N.D. and M.A.

21.    During the traffic stop, GONDO called CI-1 and GONDO said, "We got them

pulled over." CI-1 then told GONDO, "it's [a gun] in his right pocket, his jacket." GONDO replied, "You saw that shit?" CI-1 replied, "Yeah, he carry it every time he come because they come with so much money and they be scared. Cause he should have like six or seven hundred dollars on 'em too." GONDO replied, "Alright" CI-1 stated, "But yeah, he be thinking he gonna get robbed so that's why he comes every time with it [a gun]." GONDO stated, "Alright well they checked him, he, he gotta grey T-shirt on. I don't see no jacket." CI-1 replied, "It's something in there, it's in there. He's not gonna come without it." GONDO stated, "He's shaking his head [referring to one of the officers searching N.D.] saying he ain't got nothing." CI-1 replied, "It's in that car, he never comes without it." GONDO replied, "They searched him, it ain't in his pocket."

22.     During the traffic stop, RAYAM stole approximately $700 from N.D.

23.     In order to conceal their illegal conduct, GONDO authored a false Incident Report for the arrest that was filed with the BPD. Above his signature, GONDO certified that, "I affirm and declare that the statements above are true to the best of my knowledge." In that statement, GONDO reported that "at 1315 hrs" members of the GTTF conducted a traffic stop in the 3000 block of West North Avenue, Baltimore, Maryland because the driver was "following a silver van too closely at an unsafe distance." The statement continued that the GTTF members were in an unmarked vehicle "containing: Stg [A] driver, Det(s) Hersal front passenger and Rayam, Gondo Rear passenger." The report falsely stated that after the vehicle was stopped, and as HERSL and RAYAM approached the vehicle, HERSL observed N.D., "reaching from his right pants pocket, placing a small caliber firearm into a Camouflage back pack." The Incident Report falsely stated that, "All items seized were submitted to Evidence Control By Det. Rayam." GONDO, RAYAM, and HERSL did not submit the money they stole from N.D. to the BPD.

**June 24, 2016, Robbery / Extortion of M.M.**

24.    On or about June 24, 2016, Sergeant JENKINS and Detectives HENDRIX and WARD, acting in their capacity as police officers, entered a residence where M.M. was staying with a SWAT team. When SWAT left, JENKINS, WARD and HENDRIX remained to execute a search warrant. JENKINS asked M.M. how much money he had in the house and M.M. told him he had money in the upstairs bedroom.

25.    M.M. then took JENKINS, WARD and HENDRIX to the upstairs bedroom and showed them a shoe box that contained $10,000. The Officers then sent M.M. downstairs and remained in the room.

26.    JENKINS, WARD and HENDRIX stole approximately $2,000 from the shoe box that contained $10,000. They also stole $15,000 from a boot in the bedroom that also contained approximately 50 grams of heroin but left the heroin.

27.    JENKINS, WARD and HENDRIX did not submit the $2,000 from the shoe box that they stole from M.M. to BPD and did not submit the $15,000 they stole from M.M.'s boot to BPD.

**Time and Attendance Fraud**

28.    On or about July 1, 2016, RAYAM called GONDO and told him that his paycheck was for more than $4,000 and that he knew GONDO did not make as much because he had taken days off to which GONDO replied, "my shit was like 3 … $3,200. That shits goin' be stupid, yo. Jesus Christ." RAYAM then said "When I looked at it I said oh my God who did this? This is a lie." RAYAM then repeated, "over four grand, yo," to which GONDO replied, "so you damn near almost doubles the shit you did this go around." RAYAM then said, "you gotta think about it like this, yo, we get paid two times" and then, "my next check going to be at least $5,000" and "Imma be making $13,000 this month." RAYAM and GONDO then discussed

how JENKINS, HENDRIX, TAYLOR and WARD had been committing overtime fraud for, "a whole year" making "at least $8,000 to $10,000 a month."

### July 8, 2016, Robbery / Extortion of R.H. and N.H.

29.     On July 8, 2016, RAYAM submitted an affidavit, under oath, to a Maryland State Circuit Court Judge, asking for authorization to search R.H. and N.H.'s home. The affidavit falsely stated that "[o]n July 5, 2016 Sgt. Jenkins, Det. Rayam, and Det. Gondo conducted a full day of surveillance on [R.H.]. At approximately 0940 hrs. R.H. was observed exiting [his residence] and entering into his [vehicle]. At 1030 hrs. R.H. arrived at [a location in Elkridge, Maryland] and stayed for approximately 1 hr. and 20 min." RAYAM and GONDO were both at home in their residences when they claimed to be conducting surveillance of R.H.

30.     On July 8, 2016, at approximately 3:00 p.m., GONDO called J.C. During the call GONDO said, "Hey John [J.C.], we're pulling them over." J.C. replied, "All right. I'm waiting on you." RAYAM said, "He [JENKINS] gave the order. We pull them over, bring them back to the academy. That's per, Sergeant Jenko [JENKINS]." J.C. then said, "All right. I got you. Hold on."

31.     RAYAM, GONDO and HERSL then initiated a traffic stop of R.H. and N.H. When RAYAM took R.H. out of his car, RAYAM asked him, "where's the money?" R.H. had approximately $3,400 on his person which RAYAM stole.

32.     At approximately 3:11 p.m., GONDO called JENKINS. During the call, GONDO said, "Hey, what's up. We, ah, we headed down now [to a BPD off-site facility]. We go, um, got the package [R.H. is in custody]." JENKINS said, "Hold on one second, hey, hey, he's [R.H.] in the car with you?" GONDO replied, "Yeah, I got, I got the, um, male [R.H.] and they got the female [N.H.]." JENKINS said, "Okay, hey, uh, did you tell them anything at all?" GONDO

9

replied, "No." JENKINS continued, "All right. Just tell them you gotta wait for the U.S. Attorney . . ." GONDO, "Yeah, we gonna meet up with you and [unintelligible]." JENKINS said, "Okay, and when I get there, treat me like I'm the fucking U.S. Attorney. Like, hey Sir, how are you, we got our target in pocket. And then introduce me as the U.S. Attorney." GONDO said, "I got you."

33.     Following this call, JENKINS and RAYAM interviewed R.H., in custody, at a BPD office. JENKINS told R.H. that he was a federal officer. JENKINS and RAYAM asked R.H. if he had any money in his residence and R.H. told them he had $70,000 in cash.

34.     JENKINS, RAYAM, GONDO and HERSL then transported R.H. and N.H. to their home. Once at the house, JENKINS, RAYAM and GONDO asked R.H. where he kept his cash and he told them that it was in the closet in the master bedroom. In that closet, R.H. had $70,000 in cash in two heat sealed bundles, one in the amount of $50,000, consisting of $100 bills and $20 bills, and the other in the amount of $20,000, consisting entirely of $100 bills. R.H. had an automobile dealer's license and bought and sold used cars at car auctions, where he paid in cash. R.H. also made significant income from gambling at the Maryland Live Casino in Anne Arundel County. He and his wife also operated an assisted living facility.

35.     JENKINS, GONDO and RAYAM then went upstairs to R.H.'s bedroom, where R.H. had told them he kept the $70,000. JENKINS, GONDO, RAYAM and HERSL stole the heat sealed bundle containing $20,000 in denominations of $100 bills.

36.     Later, JENKINS asked R.H. if he could identify someone that the GTTF could rob. JENKINS told him, you take care of us, we take care of you, or words to that effect, and that if R.H. identified someone "big" for the GTTF to rob, R.H., could wind up with "ten kilos" of drugs in his backyard, that R.H. could then sell.

37.     On July 8, 2016, at approximately 7:38 p.m., GONDO called N.F. While the telephone was ringing, GONDO and RAYAM discussed stealing money from R.H. and N.H.'s

home. Specifically, GONDO told RAYAM, "I mean, if they're not gonna take the, it ain't that serious, just leave the fuckin' money." RAYAM said, "Was I loud?" GONDO then laughed and said, "Shit man! Who gives a fuck. Give it to us. We'll take it. Shit, nigger. Yeah, ah, lemme, lemme, lemme git it. Give it back to me so I can take um, take one stack [$1000] out of there."

38.    On July 8, 2016, at approximately 10:35 p.m., GONDO called a female only identified as "Lee". In the beginning of the call, GONDO said, "Hey, listen, don't hang up. This is a two second conversation. Hold on." GONDO, at approximately 10:36 p.m., then answered an incoming call from RAYAM where the two discussed dividing up the money they had stolen from R.H.'s home. RAYAM said, "Yo, real talk. I'm counting." GONDO interrupted him and said, "No, negative. I would never, c'mon, man." RAYAM said, "Hey, ahright again, yo. Ima count it [money] again, yo. I'm just lettin' you know." GONDO talked over RAYAM and said, "Hey, I would never [unintelligible]." RAYAM said, "Hey bro, well I'm just lettin' you know, if it's a mistake [unintelligible]." GONDO said, "I don't make mistakes, countin' money." RAYAM replied, "I'm lettin' you know." GONDO talked over him and then RAYAM said then "I don't got no reason to lie, man. I'm just lettin' you know, yo. Ahright." GONDO then returned to the telephone call with Lee. Several minutes later and at the end of the conversation, GONDO said, "This nigger sayin' I'm three grand [$3,000] short, though. I'm just so mad about that." Lee responded, "Well, I don't know what you are talking about, but you called me, so I would think you outta be talking to me and not countin' money or whatever you're doing." After a pause, GONDO continued his conversation with Lee who complained that GONDO was not paying attention to her and said, "And then you fuckin' side tracked the whole conversation about, oh, why am I short three thousand dollars or three hundred dollars or whatever you said." GONDO then said, "That just, that just doesn't make sense [RAYAM's assertion that the money was short]." GONDO then said louder, "Hey, listen. Let me, let me, let me, hey, I'm a call you right back,

11

babe. This is business. Let me handle this business real quick." GONDO then said, "I'm a call you right back. No, this is about finances. Let me call you back."

39. On July 8, 2016, at approximately 10:45 p.m., GONDO received an incoming telephone call from RAYAM who asked GONDO to meet with him to discuss the money they had stolen from R.H. and N.H.

40. In order to conceal their illegal conduct, RAYAM authored a false Incident Report for the arrest of R.H. and N.H. and the subsequent search of their home that was filed with the BPD. Above his signature, RAYAM certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS approved the report. In that statement, RAYAM failed to disclose the $3,400 that had been stolen from R.H. during the traffic stop and the $20,000 that was stolen from R.H. and N.H.'s home.

41. On July 11, 2016, GONDO deposited $8,000 in cash into his Bank of America checking account.

### Week of July 11 to 16, 2016, Time and Attendance Fraud

42. On July 11, 2016, at 10 a.m., GONDO called RAYAM. GONDO asked RAYAM where he was and RAYAM reported that he had just dropped his kids off and had to run a couple of errands. GONDO then asked RAYAM if he was going home. RAYAM replied, "I need to get some sleep my nigga. Yo please yo please we can do this thing tomorrow morning yo but right now I am not trying to see downtown," referring to not coming in to BPD headquarters in downtown Baltimore City. RAYAM then told GONDO that he would fill out his Individual Overtime Reports tomorrow. GONDO then told RAYAM, "My nigga, it's a slash day today thats what you telling me man." A "slash day" refers to the fact that GONDO and RAYAM would be credited as working that day in the time and attendance record book. RAYAM then

said, "Oh hold on were you trying to do some work? I mean if you trying to do some work I'll come down," to which GONDO responded, "we don't got no lights," referring to the fact that BPD vehicle GONDO drove did not have emergency lights mounted on it, and then said, "I mean fuck it just hit me when you can get up man," and then later said, "We got the whole week yo. We got the whole week brother," referring to the fact that Sergeant JENKINS was on vacation in Myrtle Beach, South Carolina, that week with his family.

43.    On July 11, 2016, at 7:34 p.m., S.S. called GONDO. S.S. said to GONDO, "I didn't know you wuz home, man. I thought you was workin' or something." GONDO replied, "Nawm whatchuacallum off for a week [referring to Sergeant JENKINS, who was on vacation with his family in Myrtle Beach, South Carolina, from July 11, 2016 until July 16, 2016], so you know, everybody just takin' it easy for real." S.S. then said, "about Wayne," to which GONDO replied, "Yeah, yeah, so niggers just takin' it easy." Later in the call S.S. told GONDO to "enjoy his day off."

44.    On July 14, 2016, at 1:25 p.m., RAYAM called GONDO. RAYAM asked GONDO if he was home and GONDO told him that he was. RAYAM then described to GONDO a conversation he had just had with a confidential source who told him that his brother had a gun under his passenger car seat in front of his Grandmother's house. RAYAM reported that he had asked the source how long he would be there and the source said 20 minutes. GONDO told RAYAM he could meet him at his, GONDO's, house. GONDO told RAYAM that he would "throw on some jeans," to which RAYAM responded, "this way we don't have to go into work later." GONDO and RAYAM also discussed calling "John" [J.C., another member of the GTTF at that time] and involving him in the operation because RAYAM "[didn't] feel like processing" the evidence.

45.     On July 14, 2016, at 7:16 p.m., RAYAM called GONDO. RAYAM asked "[are]
we done yet?" GONDO responded that "they got a gun at 4" referring to 4 p.m. According to a
Incident Report authored by HENDRIX, on July 14, 2016, HENDRIX, WARD and TAYLOR
arrested K.D. at 4 p.m. and transported him to Central Booking. GONDO, HERSL and RAYAM
are not listed on the Incident Report as participating in the arrest.

46.     RAYAM then asked GONDO to get an Individual Overtime Report signed for
him. GONDO said he didn't know if he could to which RAYAM said, "no sweat" and that "he
may still put one in anyway." RAYAM then asked if GONDO was around the other members of
the GTTF and GONDO replied "they are still processing." RAYAM then asked if "Danny"
[HERSL] was there and GONDO said, "no, he out, he probably at the bar."

47.     At 8:08 p.m., GONDO called RAYAM. He told him his check, for the previous
14-day pay period, was "5700 [$5,700]." GONDO told RAYAM he had been paid for "102"
hours of overtime. RAYAM said that's "where he should be at." RAYAM then told GONDO
he was in the poker room at Maryland Live Casino, in Anne Arundel County, Maryland.

48.     At 9:45 p.m., GONDO called RAYAM and told him he was going to get a drink
"downtown" with "his man."

49.     GONDO submitted an Individual Overtime Report for July 14, 2016 and into July
15, 2016, where he falsely claimed to have worked an assigned shift from "8 to 4" and then
falsely claimed 8 hours of "daily overtime" from 4:15 p.m. on July 14, 2016 until 12:15 a.m. on
July 15, 2016, for a total of 16 hours worked on July 14, 2016. In the section, "Overtime Work
Performed – Explain" the following appears: "OIS Crime Suppression NED 4X4". GONDO
signed the report under the affirmation that, "We certify that the overtime hours reported herein
are authorized, were in fact worked, and are correct."

50.     RAYAM submitted an Individual Overtime Report for July 14, 2016 and into July 15, 2016, where he falsely claimed to have worked an assigned shift from 8 a.m. to 4 p.m. and then falsely claimed 8 hours of "daily overtime" from 4:15 p.m. on July 14, 2016, until 12:15 a.m. on July 15, 2016. In the section, "Overtime Work Performed – Explain" the following appears: "OIS Crime Suppression HGV 4600 Grindon, 4-160705968. This is the location and number of the arrest made by HENDRIX, TAYLOR and WARD. According to the Incident Report, RAYAM did not participate in the arrest. RAYAM signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

51.     HERSL submitted an Individual Overtime Report for July 14, 2016 and into July 15, 2016, where he falsely claimed to have worked an assigned shift from 8 a.m. to 4 p.m. and then falsely claimed 8 hours of "daily overtime" from 4:15 p.m. on July 14, 2016, until 12:15 a.m. on July 15, 2016. In the section, "Overtime Work Performed – Explain" the following appears: "HGV 4-160705968 – 4600 Grindon Ave OIS Crime Suppression." This is the number for the arrest that HENDRIX, TAYLOR and WARD made at 4 p.m. that day. According to the Incident Report, HERSL did not participate in the arrest. HERSL signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

52.     On July 15, 2016, at 9:31 a.m., GONDO called RAYAM. During the call RAYAM told GONDO he wasn't coming in to work because he had to "take care of shit at home." RAYAM then said that tomorrow he was going to "See what's up." GONDO then said, "easy money J. Easy money," and "one hour can be eight hours," referring to working one hour and then claiming to have worked eight hours on official time and attendance records.

53.     On July 15, 2016, at 11:01 a.m., GONDO told RAYAM. He told him, "Man, I'm

downtown. I called the nigger John [another member of the GTTF at that time], he's like, I'm

here. I'm like, what's goin' on. He like, I'm gonna look into some things. GONDO then told

RAYAM that HERSL was not coming in. GONDO then told RAYAM, "I'm goin' home, goin'

to sleep. Fuck that shit yo," to which RAYAM responded, "That's why I wasn't, yeah man. I

work that overtime slip out when Wayne [JENKINS] comes back, man."

54.     On or about July 18, 2016, JENKINS submitted an Individual Overtime Report

for July 11, 2016 and falsely claimed to have worked 8 hours of overtime for "Proactive

Enforcement WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He

falsely claimed to have worked, in total, from 6 p.m. on July 11, 2016 until 2 a.m., on July 12,

2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on

vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime

hours reported herein are authorized, were in fact worked, and are correct."

55.     On or about July 18, 2016, JENKINS submitted an overtime report for July 12,

2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD

[Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to

have worked from 7:15 p.m. on July 12, 2016, to 3:15 a.m. on July 13, 2016, when, in fact,

JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed

the report under the affirmation that, "We certify that the overtime hours reported herein are

authorized, were in fact worked, and are correct."

56.     On or about July 18, 2016, JENKINS submitted an overtime report for July 13,

2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD

[Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to

have worked work from 6 p.m. on July 13, 2016, to 2 a.m. on July 14, 2016, when, in fact,

16

JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

57.     On or about July 18, 2016, JENKINS submitted an overtime report for July 15, 2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to have worked from 8:39 a.m. to 4:39 p.m. on July 15, 2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

58.     On or about July 18, 2016, JENKINS submitted an overtime report for July 16, 2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to have worked from 10 a.m. to 6 p.m. on July 16, 2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

### July 23 to 24, 2016, Time and Attendance Fraud

59.     On July 23, 2016, at 1:30 p.m., GONDO called M.Mo. The two discussed what they had done the night before. GONDO told M.Mo. that he was just getting up. He further told M.Mo. that he was "going in at 8 tonight."

60.     At 1:52 p.m., GONDO called his girlfriend, N.F. He told her he had to work tonight. She asked him "3 to 3, right?" He responded, "yeah, but they sayin' not to come in until 8." GONDO then told N.F. that he was, "tired of working."

61.    At 4:31 p.m., GONDO called RAYAM. RAYAM told GONDO that he could not come into work until 9 p.m. because he had to watch his children. RAYAM also told GONDO that they are working "3 to 3" but aren't coming in until 8, so it will be 4 hours of overtime because they will "hit the street and get 2 guns." GONDO responded that he, "doesn't want to work."

62.    At 4:48 p.m., RAYAM called GONDO. He told GONDO that he had spoken with JENKINS and that JENKINS told him that it was, "gonna be just GONDO and JENKINS tonight." RAYAM then told GONDO that JENKINS offered to "call GONDO back and push it back to 9" so that RAYAM could also go out with them. RAYAM then said that his wife may not come back until 10 p.m. and that he "[didn't] want to hold y'all up," so JENKINS said "just y'all two," referring to GONDO and JENKINS.

63.    At 5:32 p.m., JENKINS called GONDO. The two agreed to meet at BPD at nine p.m. JENKINS said, "that way we have time to go out to eat with our families." JENKINS then said, "[h]ey. Hey. We don't get off till 3, but we aren't stayin' until fuckin' 3," to which GONDO replied, "[r]ight. I got you. I got you."

64.    At 5:35 p.m., RAYAM called GONDO. He told him that he had told his wife to stay in Pennsylvania so RAYAM would not be working. RAYAM said he thought it was "going to be like four guys tonight," to which GONDO responded, "[a]ll them niggers had plans."

65.    GONDO submitted an Individual Overtime Report for July 23, 2016, and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. GONDO falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. JENKINS approved the Individual Overtime Report. GONDO was, in fact, in the vicinity of his home in Owings Mills, Maryland, outside of Baltimore City, until after 8 p.m. on July 23, 2016.

GONDO signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

66. JENKINS submitted an Individual Overtime Report for July 23, 2016, and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. JENKINS falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 23, 2016. JENKINS returned to the vicinity of his home in Middle River, Maryland, for at least 3 hours in the evening of July 23, 2016, when he claimed to be working. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

67. RAYAM submitted an Individual Overtime Report for July 23, 2016, and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. RAYAM falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. JENKINS approved the Individual Overtime Report. RAYAM was, in fact, in the vicinity of his home for the entire day on July 23, 2016. RAYAM signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

68. HENDRIX submitted an Individual Overtime Report for July 23, 2016, and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. HENDRIX falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. JENKINS approved the Individual Overtime Report. HENDRIX was, in fact, in the vicinity of his home for the entire day on July 23, 2016. HENDRIX signed the report under the

affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

69.     TAYLOR submitted an Individual Overtime Report for July 23, 2016 and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. TAYLOR falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. JENKINS approved the Individual Overtime Report. TAYLOR was, in fact, in New York City on July 23 and July 24, 2016, on vacation. TAYLOR signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

70.     WARD submitted an Individual Overtime Report for July 23, 2016, where he falsely claimed to have worked a "Mandatory 12 Hour Shift" from 3 p.m. to 11 p.m. and then overtime from 11:16 p.m. to 3:15 a.m. on July 23, 2016. JENKINS approved the Individual Overtime Report. WARD was, in fact, in the vicinity of his home in Middle River, Maryland, outside of Baltimore City, for the entire day on July 23, 2016. WARD signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

71.     HERSL submitted an Individual Overtime Report for July 23, 2016, where he falsely claimed to have worked a "Mandatory 12 Hour Shift" from 3 p.m. to 11 p.m. and then overtime from 11:16 p.m. on July 23, 2016, to 3:15 a.m. on July 24, 2016. JENKINS approved the Individual Overtime Report. HERSL was in Bel Air, Maryland, outside Baltimore City, and Canton in the evening on July 23, 2016. HERSL signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

### August 1, 2016, Time and Attendance Fraud

72.     On or about August 2, 2016, WARD submitted an Individual Overtime Report for

August 1, 2016 where he falsely claimed to have worked 13 hours and 45 minutes of overtime

for "HGVx4 Proactive Enforcement." WARD flew to Myrtle Beach, South Carolina, on July 29,

2016 and did not fly back to Baltimore until August 2, 2016. WARD signed the report under the

affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact

worked, and are correct."

### August 8 and 9, 2016, Time and Attendance Fraud

73.     HENDRIX, TAYLOR and WARD went on vacation in the Dominican Republic

from August 5 to 9, 2016. HENDRIX, TAYLOR and WARD failed to request time off for

vacation and instead were paid for their assigned shift, 8 a.m. to 4 p.m., on August 8 and 9, 2016.

### August 24, 2016, Robbery / Extortion of A.F.

74.     On or about August 24, 2016, Sergeant JENKINS and Detectives GONDO,

RAYAM, HENDRIX and HERSL, acting in their capacity as police officers, conducted a traffic

stop of A.F. and detained him.

75.     While A.F. was detained, JENKINS, GONDO, RAYAM, HENDRIX and HERSL

stole narcotics and $1700 from him and then released him.

76.     To conceal their illegal conduct, JENKINS, GONDO, RAYAM, HENDRIX and

HERSL did not prepare an Incident Report regarding the traffic stop.

77.     JENKINS, GONDO, RAYAM, HENDRIX, and HERSL did not submit to BPD

the $1700 stolen from A.F.

### August 24, 2016, Robbery / Extortion of J.B.

78.    On or about August 24, 2016, at 10:45 a.m., Detectives HERSL, GONDO and RAYAM, acting in their capacity as police officers, stopped J.B. on the street.

79.    HERSL ordered J.B. to get into the BPD vehicle that he, HERSL, GONDO and RAYAM, were operating. RAYAM then asked J.B. for the number of his apartment and asked him, "is there a gun in there" to which J.B. responded, "[n]o, there's not," and then RAYAM asked him, "[i]s there any large sums of money," to which J.B. responded "no."

80.    RAYAM took J.B.'s car keys and conducted a search of J.B.'s car, which J.B. had just exited. RAYAM then took J.B. into his home.

81.    At 10:54 p.m., GONDO called JENKINS. GONDO told JENKINS that, "[w]e in the house now, man. If you want to come over." JENKINS asked GONDO, "you guys getting a warrant," to which GONDO replied, "I'm not too sure what Rayam's gonna do yet." JENKINS then asked for the address and said he would "see [them] in a second." At 11:02 p.m., JENKINS called GONDO while he was driving to their location. JENKINS asked GONDO, "are you gettin' a consent," to which RAYAM replied "[w]e gonna work on that. Yeah, we gonna work on that."

82.    Once inside the house, RAYAM, in the presence of GONDO and HERSL, stole $1,500 from J.B., which J.B. had earned as a maintenance supervisor at a nursing home in Baltimore City. J.B. intended to use this money, which was in cash, to buy a money order to pay his rent.

83.    In order to conceal their illegal conduct, RAYAM authored a false Incident Report that was filed with the BPD concerning property seized from J.B. Above his signature, RAYAM certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS approved the report. In that statement, RAYAM failed to disclose the $1,500 that had

been stolen from J.B.

84.     GONDO, RAYAM, JENKINS and HERSL did not submit to BPD the $1,500 they stole from J.B.

### September 7, 2016, Robbery / Extortion of S.S.

85.     On or about September 7, 2016, Sergeant JENKINS and Detectives GONDO, HERSL, RAYAM, TAYLOR and WARD, in their capacity as police officers, stopped S.S. as he attempted to leave the parking lot of a storage facility in Baltimore City. TAYLOR told S.S. that they had a warrant to search his storage unit when, in fact, they did not. HERSL, JENKINS and RAYAM then went into S.S.'s storage unit and took a sock containing $4,800 from the unit and took $2,000 from it. RAYAM then gave the sock, now containing only $2,800, back to S.S. and told him to leave.

86.     At the scene of the incident, inside a BPD vehicle, RAYAM described to GONDO how he told JENKINS that he had only "taxed" S.S., a "little bit" referring to only stealing some of S.S.'s cash and that because they had not arrested S.S., "[h]e, [S.S.] won't say nothing" to other law enforcement authorities. RAYAM also told GONDO, that he had to give "Wayne," referring to Wayne JENKINS, "a hundred dollars" of the cash stolen from S.S.

87.     To conceal the robbery and extortion, Sergeant JENKINS and Detectives GONDO, HERSL, RAYAM, TAYLOR and WARD did not prepare an Incident Report regarding the arrest. Sergeant JENKINS and Detectives GONDO, HERSL, RAYAM, TAYLOR and WARD did not submit to BPD the money stolen from S.S.

**Coaching One Another in Advance of Internal Investigation Division (IID) Interviews**

88.     On or about September 7, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. GONDO asked RAYAM if he was going to the Internal Investigations Division (IID) to be interviewed. RAYAM told GONDO he had to give IID a report on the 15th. GONDO responded that he told "Sarge" not to, "say anything about the entry."

89.     On or about September 13, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. They discussed how what is recorded on their body cameras will "come back to bite [them]." RAYAM told GONDO that he was going to meet up with Sergeant A. to "coach him" before he is interviewed by IID.

**Turning Off their Body Cameras**

90.     On or about September 22, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. They discussed an incident where JENKINS was fighting with a civilian and "hit the phone out of her hand." GONDO told RAYAM, "I turned the camera off" referring to his body camera. RAYAM responded, "Oh yeah, fuck that shit" and then said "so basically you were never here."

**Planning Additional Robberies**

91.     On September 22, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. RAYAM told GONDO, "He [JENKINS] told me about that, ah, he put me onto some big shit, yo, so I'm gonna start lookin' into this dude, I was tellin' him whatchu you goin' doin' in pockets [referring to robbing people of money they kept in their pockets], it's a fuckin' waste of time man . . . But he's just like, yo, you know, um, I got big dude, I was tired of putting my name on it, I was just goin' to give it to you motherfuckers." GONDO then asked if JENKINS provided the name of the "big dude" that they could rob. RAYAM responded,

24

Naw, he said he's tired on puttin' his name on shit [referring to JENKINS putting his name on Statements of Probable Cause and other official BPD documents]. I was like, give me the motherfucker, I put my name on it . . . but then he was like, yo, this dude's good for at least two hundred [referring to $200,000], yo, we could get'em. I was like, ah right. He was like if we do it, you know, it'll be me and you, and I was like, ahright, and G [referring to GONDO]. He was like yeah. And then I was like, well, what's up with the other dudes, your boys, you know [referring to HENDRIX, TAYLOR and WARD]. He was just like, nah, nah, they cool. I love them to death. Then he brought up the one where he, um, when they went outside and after everybody put up 20 dollars [meaning came away from the robbery with $20,000 each], you know what I'm talkin' about? Everybody was, he talked about the time where everybody had 20 g's [referring to $20 grand or $20,000].

GONDO responded, "you tellin' me he said that?" to which RAYAM then replied,

He was just like, man, honestly, I [UI] even got that much. I put all that time and work, they [referring to HENDRIX, TAYLOR and WARD] was just with me, and I was like, you right. So I said you right, cause G [GONDO] knows, when I get something,' or if my name on it, I'm getting' the more, cause I'm the one, he was like, yup, you put so much time in it. So actually I think it should have been 60 [$60,000], 10 [$10,000], 10 [$10,000]and 10 [$10,000], that's what he said, or five [referring to $5,000 instead of $10,000] actually [referring to how the proceeds of a robbery should have been divided among JENKINS, and HENDRIX, TAYLOR and WARD]. I was like, I don't know about that. But, he was like, I'm tired of [UI]. I'm tired of doin' all this work. I was like, yo, that makes sense, yo. But, I'm gonna see what's up with this dude and shit. I told him, I asked him, how long you think it take to get us, 'cause you know, I need 50 grand right now [referring to $50,000]. So he say, how long you think its gonna take. I was like a month, naw, we do it right, a couple of weeks. I was like, all right, I'll be hittin' him on them slash days you give us."

RAYAM then told GONDO, "I need a big one."

### Alerting One Another to Investigations into their Criminal Conduct

92.     On October 5, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. The two were discussing how JENKINS had received information that the GTTF was under investigation. GONDO said that "people" had been saying GONDO was the "biggest drug dealer in the department because he has money." GONDO described how JENKINS had told

him that JENKINS had heard that GONDO was on a wiretap.  GONDO said JENKINS told him

it could be the "Feds" referring to federal law enforcement investigating their illegal activities,

and that the investigation could have been on-going for five years, to which GONDO responded,

"what case?  It's no Pablo Escobar.  It's POLICE."  GONDO then said, "King and Murray, it

was like a year or 9 months, that's it, Sylvester, it was months, Nigga Richburg, it was months,"

referring to police officers, King, Murray, Sylvester and Richburg, who were prosecuted for

robbing civilians and the amount of time that GONDO believed they were each under

investigation.

18 U.S.C. § 1962(d)

## COUNT TWO
## (RICO)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs One through Fourteen, Sixteen and Eighteen through Ninety-Two of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Indictment.

### THE RACKETEERING VIOLATION

2.      From in or about 2015, until the date of this Indictment, in the District of Maryland, Sergeant WAYNE JENKINS and Detectives MOMODU GONDO, EVODIO HENDRIX, DANIEL HERSL, JEMELL RAYAM, MARCUS TAYLOR and MAURICE WARD, the defendants, together with others known and unknown to the Grand Jury, being persons employed by and associated with the Baltimore Police Department, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of the following acts: Racketeering Acts One through Thirty-Four below.

### THE PATTERN OF RACKETEERING ACTIVITY

3.      The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act One
(November 27, 2015 Robbery / Extortion of H.T.)

4.      On November 27, 2015, Detective HERSL and Detective 1 and Sergeant 1, acting in their capacity as police officers, arrested H.T.

5.      Detective 1 searched H.T. and seized approximately $530 from him and a paystub. H.T. had earned the money from his job as an HVAC engineer.

6.      Detective 1 turned the money over to HERSL.

7.      HERSL only submitted $218 of the $530 that was taken from H.T. to the BPD.

8.      To conceal his illegal conduct, on November 27, 2015, HERSL authored a false Incident Report that was filed with the BPD supporting the arrest of H.T. Above his signature, HERSL certified that, "I affirm and declare that the statements above are true to the best of my knowledge." The Incident Report falsely states that HERSL recovered $218 from H.T. when in truth and fact, $530 was taken from H.T. when he was arrested.

9.      On or about November 27, 2015, in the District of Maryland, Detective DANIEL HERSL, the defendant, committed the following acts, any one of which alone constitutes the commission of Racketeering Act One:

> a.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and anything of value from H.T. with H.T.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

> b.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from H.T. with H.T.'s consent under color and pretense of office, under

color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.   attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

d.   committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Two**
(November 28, 2015 Robbery / Extortion of A.S.)

10.     On or about November 28, 2015, Detective HERSL and Sergeant. 1, acting in their capacity as police officers, arrested A.S.

11.     HERSL seized $500 from A.S., which A.S. had earned in his job with a company that cleans office buildings overnight.  A.S. is paid in cash.  A.S. intended to use the money to pay his rent.

12.     HERSL only submitted $218 of the $500 that he took from A.S. to BPD.

13.     To conceal his illegal conduct, on November 27, 2016, HERSL authored a false Incident Report that was filed with the BPD supporting the arrest of A.S.  Above his signature, HERSL certified that, "I affirm and declare that the statements above are true to the best of my knowledge."  In that Incident Report, HERSL falsely stated that he recovered $218 from A.S., when in truth, HERSL had taken more than $500 from A.S.

14.     On or about November 28, 2015, in the District of Maryland, Detective DANIEL HERSL, the defendant, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Two:

a.   as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and

29

anything of value from A.S. with A.S.'s consent under color and pretense of
office, under color of official right, and by wrongful use of actual and threatened
force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

b. as an officer or employee of the State of Maryland, to wit, as a police officer and
employee of the BPD, wrongfully obtained money, property and anything of
value from A.S. with A.S.'s consent under color and pretense of office, under
color of official right, and by wrongful use of actual and threatened force and
violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c. attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402;
and

d. committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Three
(March 9, 2016 Robbery / Extortion of M.MC.)

15.     On or about March 9, 2016, Sergeant JENKINS and Detectives HENDRIX,
TAYLOR and WARD, acting in their capacity as police officers, arrested M.MC.

16.     At the time of the arrest, JENKINS, HENDRIX, TAYLOR and WARD stole at
least $1000 from M.MC.

17.     To conceal their illegal conduct, on or about March 9, 2016, WARD authored a
false Incident Report that was approved by JENKINS and was filed with the BPD supporting the
arrest of M.MC. Above his signature, WARD certified that, "I affirm and declare that the
statements above are true to the best of my knowledge." WARD falsely wrote in the Incident
Report that the only property seized from M.MC. was a shoe bag, a t shirt, a handgun with
ammunition, a plastic bag, and four small baggies of marijuana.

18.    JENKINS, HENDRIX, TAYLOR, and WARD did not submit the $1000 they stole from M.MC. to BPD.

19.    On or about March 9, 2016, Sergeant WAYNE JENKINS and Detectives EVODIO HENDRIX, MARCUS TAYLOR and MAURICE WARD, the defendants, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Three:

        a.   as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together to wrongfully obtain money, property and anything of value from M.MC.'s with M.MC.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

        b.   as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from M.MC. with M.MC.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

        c.   as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from M.MC. with M.MC.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

        d.   unlawfully conspired together to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

   e. attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

   f. committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Four
(March 22, 2016 Robbery / Extortion of O.S.)

20.    On or about March 22, 2016, Sergeant JENKINS and Detectives HENDRIX, TAYLOR and WARD, acting in their capacity as police officers, conducted a traffic stop and arrested O.S. The defendants seized suspected narcotics and $21,500 from O.S. JENKINS, HENDRIX, TAYLOR and WARD provided to BPD only $15,000 of the $21,500 that they took from O.S. At the time of the arrest, the defendants also took O.S.'s house key and looked at his driver's license which identified the location of O.S.'s residence.

21.    To conceal their illegal conduct, on or about March 22, 2016, HENDRIX authored a Incident Report that was approved by JENKINS and was filed with the BPD, supporting the arrest of O.S. Above his signature, HENDRIX certified that, "I affirm and declare that the statements above are true to the best of my knowledge." HENDRIX falsely wrote in the Incident Report that only $15,000 was seized from O.S., when, in fact, JENKINS, HENDRIX, TAYLOR and WARD had taken $21,500 from O.S.

22.    Following the arrest of O.S., JENKINS, HENDRIX, TAYLOR and WARD entered O.S.'s residence. JENKINS, HENDRIX, TAYLOR and WARD stole money, including approximately $200,000 from a safe they opened and from two bags they seized, and property, including a Breitling men's wristwatch valued at $4,000 from the location. JENKINS, HENDRIX, TAYLOR and WARD did not submit this money and property to BPD.

23.    On or about March 22, 2016, in the District of Maryland, Sergeant WAYNE JENKINS and Detectives EVODIO HENDRIX, MARCUS TAYLOR and MAURICE WARD,

the defendants, committed the following acts, any one of which alone constitutes the commission
of Racketeering Act Four:

    a. as officers or employees of the State of Maryland, to wit, as police officers and
employees of the BPD, unlawfully conspired together to wrongfully obtain
money, property and anything of value from O.S. and D.H. with O.S.'s and
D.H.'s consent under color and pretense of office, under color of official right,
and by wrongful use of actual and threatened force and violence in violation of
MD. CODE ANN., Crim. L. § 1-203 and §3-702;

    b. as officers or employees of the State of Maryland, to wit, as police officers and
employees of the BPD, wrongfully attempted to obtain money, property and
anything of value from O.S. and D.H. with O.S.'s and D.H.'s consent under color
and pretense of office, under color of official right, and by wrongful use of actual
and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-
702;

    c. as officers or employees of the State of Maryland, to wit, as police officers and
employees of the BPD, wrongfully obtained money, property and anything of
value from O.S. and D.H. with O.S.'s and D.H.'s consent under color and
pretense of office, under color of official right, and by wrongful use of actual and
threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

    d. unlawfully conspired together to commit robbery in violation of MD. CODE ANN.,
Crim. L. § 1-203 and § 3-402;

    e. attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402;
and

    f. committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Five**
(May 11, 2016 Robbery / Extortion of N.D.)

24.    On or about May 11, 2016, in the District of Maryland, Detectives DANIEL

HERSL, MOMODU GONDO and JEMELL RAYAM, the defendants, committed the following

acts, any one of which alone constitutes the commission of Racketeering Act Five:

a.   as officers or employees of the State of Maryland, to wit, as police officers and

employees of the BPD, unlawfully conspired together to wrongfully obtain to

obtain money, property and anything of value from N.D. with N.D.'s consent

under color and pretense of office, under color of official right, and by wrongful

use of actual and threatened force and violence in violation of MD. CODE ANN.,

Crim. L. § 1-203 and § 3-702;

b.   as officers or employees of the State of Maryland, to wit, as police officers and

employees of the BPD, wrongfully attempted to obtain money, property and

anything of value from N.D. with N.D.'s consent under color and pretense of

office, under color of official right, and by wrongful use of actual and threatened

force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.   as officers or employees of the State of Maryland, to wit, as police officers and

employees of the BPD, wrongfully obtained money, property and anything of

value from N.D. with N.D.'s consent under color and pretense of office, under

color of official right, and by wrongful use of actual and threatened force and

violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.   unlawfully conspired together to commit robbery in violation of MD. CODE ANN.,

Crim. L. § 1-203 and § 3-402;

e. attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f. committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Six
(June 24, 2016 Robbery / Extortion of M.M.)

25. On or about June 24, 2016, in the District of Maryland, Sergeant WAYNE JENKINS and Detectives EVODIO HENDRIX and MAURICE WARD, the defendants, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Six:

a. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together to wrongfully obtain money, property and anything of value from M.M. with M.M..'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from M.M. with M.M..'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from M.M. with M.M..'s consent under color and pretense of office, under

color of official right, and by wrongful use of actual and threatened force and
violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together to commit robbery in violation of MD. CODE ANN.,
Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402
and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Seven
(July 8, 2016 Robbery / Extortion of R.H. and N.H.)

26.    On or about July 8, 2016, in the District of Maryland, Sergeant WAYNE
JENKINS and Detectives DANIEL HERSL, MOMODU GONDO and JEMELL RAYAM, the
defendants, committed the following acts, any one of which alone constitutes the commission of
Racketeering Act Seven:

a.  as officers or employees of the State of Maryland, to wit, as police officers and
employees of the BPD, unlawfully conspired together to wrongfully obtain
money, property and anything of value from R.H. and N.H. with R.H.'s and
N.H.'s consent under color and pretense of office, under color of official right,
and by wrongful use of actual and threatened force and violence in violation of
MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b.  as officers or employees of the State of Maryland, to wit, as police officers and
employees of the BPD, wrongfully attempted to obtain money, property and
anything of value from R.H. and N.H. with R.H.'s and N.H.'s consent under color
and pretense of office, under color of official right, and by wrongful use of actual

and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from R.H. and N.H. with R.H.'s and N.H.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Eight**
(August 24, 2016 Robbery / Extortion of A.F.)

27.     On or about August 24, 2016, in the District of Maryland, Sergeant WAYNE JENKINS and Detectives DANIEL HERSL, MOMODU GONDO, EVODIO HENDRIX and JEMELL RAYAM, the defendants, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Eight:

a.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together to wrongfully obtain money, property and anything of value from A.F. with A.F.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from A.F. with A.F.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from A.F. with A.F.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together to commit or attempt to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

## Racketeering Act Nine
(August 24, 2016 Robbery / Extortion of J.B.)

28.     On or about August 24, 2016, in the District of Maryland, Detectives DANIEL HERSL, MOMODU GONDO and JEMELL RAYAM, the defendants, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Nine:

a.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together to wrongfully obtain money, property and anything of value from J.B. with J.B.'s consent under color

and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from J.B. with J.B.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from J.B. with J.B.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Ten
(September 7, 2016 Robbery / Extortion of S.S.)

29.  On or about September 7, 2016, in the District of Maryland, Sergeant JENKINS and Detectives GONDO, HERSL, RAYAM, TAYLOR and WARD, the defendants, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Ten:

a. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together to wrongfully obtain money, property and anything of value from S.S. with S.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from S.S. with S.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from S.S. with S.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d. unlawfully conspired together to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e. attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f. committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

## Racketeering Acts Eleven through Thirty-Four
### (Wire Fraud)

30.     As sworn officers with the BPD, the defendants were required to work their assigned shifts.  If a Defendant did not work his assigned shift because, for example, they were on vacation, they were required to notify the BPD and take vacation leave.

31.     In addition, as sworn officers with the BPD, the defendants were required to submit Individual Overtime Reports when they worked more hours than their assigned shift. Officers submitting Individual Overtime Reports were required to certify that they had worked their assigned shift and then were required to certify that they worked a specific amount of overtime and provide a justification for the overtime.  Officers submitting Individual Overtime Reports were required to sign the report and obtain the signature of their supervisor under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

32.     On or about the dates listed below in the District of Maryland and elsewhere, the defendants named below and others persons known and unknown to the Grand Jury devised and intended to devise a scheme and artifice to defraud the citizens of Maryland and the Baltimore Police Department and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to wit, the defendants submitted Individual Overtime Reports claiming to have worked hours when they, in fact, did not, and the defendants failed to work during their assigned shifts.  These Individual Overtime Reports and information concerning when the defendants worked their assigned shifts was transmitted via interstate electronic wires to ADP, the company that managed BPD's payroll, approximately every 14 days on the dates listed below.

41

33.     On or about the dates listed below, in the District of Maryland and elsewhere, the defendants named below, for the purpose of executing the above-described scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds, all in violation of Title 18, United States Code, Section 1343 and Title 18, United States Code Section 2.

| Act No. | Defendant | Date | Wire Transmission |
|---------|-----------|------|-------------------|
| 11 | GONDO | 7/6/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 6/23/2016 to 7/6/2016. |
| 12 | HERSL | 7/6/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 6/23/2016 to 7/6/2016. |
| 13 | RAYAM | 7/6/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 6/23/2016 to 7/6/2016. |
| 14 | WARD | 7/6/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 6/23/2016 to 7/6/2016. |
| 15 | GONDO | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 16 | HENDRIX | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 17 | HERSL | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 18 | JENKINS | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 19 | RAYAM | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 20 | TAYLOR | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |

| 21 | WARD | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
|----|------|-----------|---|
| 22 | GONDO | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 23 | HENDRIX | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 24 | HERSL | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 25 | JENKINS | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 26 | RAYAM | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 27 | TAYLOR | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 28 | WARD | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 29 | GONDO | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |
| 30 | HENDRIX | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |
| 31 | HERSL | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |
| 32 | RAYAM | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |
| 33 | TAYLOR | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |
| 34 | WARD | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |

18 U.S.C. § 1962(c)

## FORFEITURE

RICO Forfeiture

1.      Pursuant to Title 18, United States Code, Section 1963, upon conviction of an

offense in violation of Title 18, United States Code, Section 1962, the defendants

**MOMODU BONDEVA KENTON GONDO,**
**a/k/a "GMoney" and "Mike,"**
**EVODIO CALLES HENDRIX,**
**DANIEL THOMAS HERSL,**
**WAYNE EARL JENKINS,**
**JEMELL LAMAR RAYAM,**
**MARCUS ROOSEVELT TAYLOR, and**
**MAURICE KILPATRICK WARD.**

shall forfeit to the United States of America:

    a.    any interest acquired or maintained in violation of section 1962;

    b.    any interest in, security of, claim against, or property or contractual right of any
          kind affording a source of influence over, any enterprise which the defendants
          established, operated, controlled, conducted, or participated in the conduct of, in
          violation of section 1962; and

    c.    any property constituting, or derived from, any proceeds obtained, directly or
          indirectly, from racketeering activity in violation of 1962.

2.      The interests of the defendants subject to forfeiture to the United States pursuant

to 18 U.S.C. § 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to a sum of money

representing the amount of the gross proceeds received by the defendants derived from

racketeering activity as alleged in this Indictment, for which each of the defendants are jointly

and severally liable.

Substitute Assets

3.      If any of the property described above, as a result of any act or omission of the

defendants:

    a.    cannot be located upon the exercise of due diligence;
    b.    has been transferred or sold to, or deposited with, a third party;

44

c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property that cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p) and 18 U.S.C. § 1963(m), as incorporated by 28 U.S.C. § 2461(c).


21 U.S.C. § 853
18 U.S.C. § 1963
28 U.S.C. § 2461(c)
18 U.S.C. § 924(d)

_Rod J. Rosenstein_
ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

_2/23/17_
Date

**SIGNATURE REDACTED**
Foreperson