## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No. JKB 17-0106** |
| **v.** | |
| **DANIEL THOMAS HERSL,** | |
| **Defendant** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT HERSL'S
## MOTION FOR REVIEW OF DETENTION ORDER

The United States of America, by its undersigned attorneys, hereby files this response to Defendant's Hersl's Motion for Review of Detention Order (Doc. No. 70, filed March 6, 2017). Pretrial Services has recommended that Defendant Hersl be detained because not set of conditions can assure safety to the community. The Government has reached the same conclusion and moves this Court to detain him pending his trial in this case.

### I.    PROCEDURAL HISTORY

On February 23, 2017, a federal grand jury sitting in Baltimore returned an indictment charging Defendant Hersl, and six co-defendants, with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) and Racketeering, in violation of 18 U.S.C. § 1962(c). The Indictment charges the Defendant and his co-conspirators with robbing and extorting individuals they detained and, in some cases arrested, and with committing time and attendance fraud.

On March 1, 2017, the Defendant was arrested on these charges and had an initial appearance in this Court. At that time, the Government moved for detention.

On March 2, 2017, Magistrate Judge Stephanie A. Gallagher held a detention hearing pursuant to 18 U.S.C. § 3142(f) and ordered the Defendant detained. Magistrate Judge Gallagher

found, as indicated in the Order of Detention, that "[b]ased on the government's proffer there is probable cause to believe that the defendant committed the offense(s) charged," that "by clear and convincing evidence, from the information produced at the hearing that the defendant poses a risk to the safety of other persons and the community" and that "by clear and convincing evidence that there is no condition or combination of conditions which will reasonably assure community safety."  Magistrate Judge Gallagher also provided in the detention order the following additional reasons for detention:

(1) Nature and circumstances of the alleged instant offense, which involves an egregious breach of public trust including explicit examples of this defendant's attempts to obstruct justice
(2) Weight of the evidence proffered by the government, to include audio and video recordings, eyewitness testimony, cell phone location information, and financial records, among other sources
(3) Lack of ability to trust defendant to comply with conditions of release, due to the repeated and substantial alleged abuse of authority entrusted to him by the public
(4) PTS recommendation of detention
(5) Additional reasons stated on record

Order of Detention as to Defendant Hersl (Doc. No. 60).

## II.     STANDARD OF REVIEW

"When the district court acts on a motion to revoke or amend a magistrate judge's pretrial detention order, the district court acts de novo and must make an independent determination of the proper pretrial detention or conditions of release."  *United States v. Stewart*, 19 Fed. Appx. 46, 48 (4th Cir. 2001).

## III.    ARGUMENT

The United States moves for the pretrial detention of Defendant Hersl pursuant to 18 U.S.C. § 3142(f)(1)(A) because the Defendant is charged with committing crimes of violence, namely Robbery, chargeable under Md. Code Ann., Crim. L. § 3-402 and Extortion by State or

2

local Government Officer or Employee, chargeable under MD. CODE ANN., Crim. L. § 3-702, and

18 U.S.C. § 3142(f)(2)(B) because there is a "serious risk that [the Defendant] will obstruct or

attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or

intimidate, a prospective witness or juror."

In determining whether a defendant should be detained, 18 U.S.C. § 3142 provides the

following:

> (g) Factors To Be Considered.—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
>> (1)   the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>>
>> (2)   the weight of the evidence against the person;
>>
>> (3)   the history and characteristics of the person, including—
>>> (A)   the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>>
>>> (B)   whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>>
>> (4)   the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Applying these factors, there are no conditions that will reasonably assure the safety of the

community and, therefore, the Defendant should be detained.

In terms of the nature and circumstances of the offense charged, as was proffered to

Magistrate Judge Gallagher, the Defendant is charged with engaging in crimes of violence and

obstructive conduct in order to conceal the robberies and extortions in which he has participated. Magistrate Judge Gallagher specifically found that the crimes charged in this case constitute crimes of violence.  If Defendant Hersl had engaged in a string of robberies as alleged in the Indictment, the Government would move for his detention in order to protect the community from him.  However, as charged, not only has Defendant Hersl and the other members of the conspiracy engaged in a series of robberies but they have all also engaged in obstruction of justice related to each and every one of these robberies.  Specifically, the Defendant and his co-conspirators have authored false incident reports, property receipts and other official documents to conceal their criminal conduct that they then submitted to the BPD and that were relied on by the BPD, the Baltimore City State's Attorney's Office and the courts.

One of the most extreme examples of obstructive conduct engaged in by Defendant Hersl occurred when Defendant Hersl and co-defendants Rayam and Gondo arrested a criminal defendant from whom they had stolen money on an outstanding out-of-jurisdiction warrant in Anne Arundel County in order to prevent that defendant from exposing their criminal misconduct at his trial in Baltimore City Circuit Court.  The defendant in that case, Z.N., was scheduled to go to trial on August 25, 2016.

On August 24, 2016, Hersl, Gondo, and Rayam were recorded discussing how they could prevent Z.N. from appearing at his trial scheduled for the next day.  The Defendants did this so that Gondo would not be called to testify.  During the course of its investigation, law enforcement learned that Z.N. was robbed by members of the Gun Trace Task Force.  As summarized below, Defendant Hersl urged his co-defendants to arrest Z.N. the day before his scheduled trial in order to trigger a postponement.

On August 24, 2016, at 8:43 a.m., Rayam was intercepted telling Gondo, "[y]eah, she [referring to the Assistant State's Attorney] might ask for a postponement this time, man.  Real shit, yo."  In response, Gondo told Rayam, "I'm gonna . . . she [referring to the Assistant State's Attorney] gotta ask for a postponement.   There's no way.  No way I'm goin in there."

At 8:46 a.m., Rayam told Gondo, ". . . Then let's say we have a warrant for his arrest," to which Hersl replied, "[y]up Cause the Judge won't let you take him out."  Rayam responded, "[o]h they still take a postponement.  Gondo, Rayam and Hersl then had the following exchange:

| | |
|---|---|
| Hersl: | **Y**ou gotta get that guy. If you lock him up today. Listen. If you lock this guy up today, transfer him to central bookings. They will not take him to court tomorrow because. |
| Rayam: | Well now Anne Arundel 's gonna take him, so, all we gotta do, [UI] AA County. |
| Hersl: | [UI] |
| Rayam: | Right. |
| Hersl: | **If you lock him up today., right.** |
| Rayam: | Right. |
| Hersl: | **He will not make your court tomorrow**. |
| Rayam: | **I understand that.** |
| Hersl: | **Transport of prisoners are all assigned a day ahead,** who's goin' when, where. [UI] they just can't |
| Rayam: | Yeah, but what we're sayin' is that he's in Anne Arundel County, so, we, you would still have to call Anne Arundel County Police Department to pick him up from his house. He's on house arrest. |
| Hersl: | Oh, so that's better. |
| Rayam: | Yeah. So there's no where we |
| Gondo: | I think if we tell |

| | |
|---|---|
| Rayam: | **They gonna postpone it.** |
| Gondo: | I don't think they gonna [UI], they gonna have to call him [UI] |
| Hersl: | [UI] don't even give a fuck at the moment cause he ain't gonna be AA County. |
| Rayam: | Call the lawyer [referring to the Assistant State's Attorney prosecuting the case], so she can call his lawyer and let him know. That's all I'm saying. We ain't waitin' till tomorrow cause like you said, yeah, tell her to tell him. Yeah. |

At 11:58 a.m., Gondo called an Anne Arundel County detective to determine whether there was an outstanding warrant against Z.N. in Anne Arundel County. The detective told Gondo the warrant was lodged a month ago, and that they usually tell the Anne Arundel County Police Department if the warrant was defective, which had not occurred.

At 12:16 p.m., Gondo received an incoming call from a Baltimore City Assistant State's Attorney. Gondo told the ASA that "he" referring to Z.N., had a warrant outstanding from Anne Arundel County. Gondo told the ASA that he "doesn't know how she wants to play it." The ASA said she wanted to prepare Gondo to testify tomorrow. She further told Gondo that Baltimore City Circuit Court Judge Peters was "very big" on getting cases through and that he may say "no matter what we are sending it to trial." Gondo then asked if Z.N. was on house arrest and if the ASA had an address for him. The ASA told Gondo that he was on house arrest and that she did not have address for him but that she could have someone call pretrial and find out. Gondo then said, "[y]eah, could you have somebody do that, because I, to be honest with you, I know we're gonna be on the street probably till like 5 in the morning. I know that. I know that for a fact. I'm not tryin' to, ah, do a postponement. I'd just rather be honest with you." The ASA told Gondo that "he's [Judge Peters] probably not going to postpone the case." The ASA

then told Gondo that she would call pretrial services and see what address they have listed for him for his home address.  Gondo told the ASA to text it to him.

At 3:48 p.m., Rayam and Gondo discussed service of a warrant for Z.N.'s arrest.  Rayam and Gondo then complained about "she," referring to the Assistant State's Attorney prosecuting Z.N., wanting to go to court.  Rayam then commented that the ASA never told Z.N.'s lawyer about the outstanding warrant, like Gondo and Rayam had wanted her to.  Gondo, Rayam and Hersl then had the following exchange:

| | |
|---|---|
| Rayam: | **Yeah, so, she never, she, act like she want to go to court tomorrow.** |
| Gondo: | Man. |
| Rayam: | naw, the [UI]. look, look. real talk. [UI] hang on, we gonna ride by there and we gonna see. If that car is out there. and we gonna [UI]. And once we [UI] **we gonna go to the police barracks [UI] with our police badges, and hey, we have a warrant, there's a warrant for, um, what's his name, that's it. They gonna run a check, gonna have an address,** but I see what your sayin, I mean, [UI]. now remember too, though, actually, what's the policy for warrants being served at somebody's house? If it's a felony, it's when.? You remember the policy, you can't go serve a warrant at certain times, after? Right, Dan? |
| Hersl: | Yeah, but i think that's late late. |
| Rayam: | [UI] |
| Hersl: | But i think it's like after midnight. |

At 4:06 p.m., Rayam and Gondo continued talk about Z.N.'s scheduled court appearance in Baltimore City the next day.  Gondo started laughing about Z.N.'s attorney's reaction when Gondo and Rayam arrested Z.N. Gondo then mocked the conversation he had with the ASA about the case.

At 4:28 p.m., Rayam activated his police radio and reported he was transporting an adult male (arrestee) to the Western the District in Baltimore City.  He identified the adult male as Z.N.  Hersl, Gondo, and Rayam were in the vehicle with Z.N.  At 4:58, p.m., all three talked about Z.N. and about how he will not be able to afford bail, and how, as a result, he would be unable to begin his trial scheduled for the following day.

As another example of obstructive conduct by Defendant Hersl, on August 31, 2016, Defendant Hersl and other officers engaged in a high-speed pursuit of a vehicle, and when the vehicle crashed, Defendant Hersl and his co-defendants did not come to the aid of the vehicle occupant.  Instead, Defendant Hersl and the co-defendants drove to a nearby location and watched until someone else called emergency responders to the scene of the accident and transport the vehicle occupant to the hospital.  To cover up their involvement in the unsanctioned high-speed pursuit, Defendant Hersl told his co-defendants to make false claims on their time and attendance sheets so it would not look like they were working at the time of the incident. Specifically, Defendant Hersl said that the GTTF officers should all end their overtime at 10:30 p.m. so they would appear to be off duty at the time of the accident.

In another example of Defendant Hersl's obstructive conduct, on August 1, 2016, Defendant Hersl and his co-defendants stopped A.B for not wearing a seatbelt, and later charged A.B. with several criminal offenses.  Before the episode, Defendant Hersl discussed how he had received a body camera issued by the BPD but was not using it.  Defendant Hersl was then recorded on the microphone that law enforcement had installed in a BPD vehicle as stating that he was going to put the body camera in his trunk "until someone says something to him" and "unless a complaint comes out" he "doubts" anyone will be looking for it.  Defendant Hersl explained that he planned to, "Maybe just one day go out, when we're not doin' nothin', since I

have it on and tape some video." The case against A.B. was dismissed by the State's Attorney's Office.

In addition to these episodes, the Defendant has also authored false incident reports and other official documents in order to conceal the robberies and extortions he committed. For example, as described in Count Two of the Indictment, on November 27 and 28, 2015, the Defendant robbed two individuals, H.T. (Racketeering Act One) and A.S. (Racketeering Act Two) and submitted false incident reports that underreported the amount of money he seized from them. *See* Indictment ¶¶ 9 and 13. All BPD incident reports, including these two, contain the following affirmation: "I affirm and declare that the statements above are true to the best of my knowledge." Thus, the Defendant has repeatedly made false statements in criminal justice proceedings. These incident reports are then used to draw up formal charges against arrestees, as the Defendant knows. These incident reports are relied upon by the BPD, the State's Attorney's Office and the state courts. The Defendant's argument that he can be trusted to provide truthful information to various actors in the criminal justice system, including this Court, is contradicted by this conduct. Further, it is worth noting that the Defendant engaged in obstructive conduct when the stakes were far lower than they are now.

In terms of the weight of the evidence, in the course of the investigation, the FBI received court authorization to intercept phones used by members of the conspiracy, installed a video and audio recording device in a BPD vehicle used by members of the conspiracy, obtained City Watch and closed circuit television camera video recordings of some of episodes charged in the indictment, obtained GPS location data from the Defendant's and his co-conspirators' cell phones, obtained financial records, travel records and other records showing the Defendant's and his co-conspirator's locations and other evidence. In addition, the victims have provided

testimony corroborated by contemporaneous recorded calls they made from the detention centers where they were housed where they described the events in this case and other law enforcement officers have also provided statements that corroborate the victims' testimony.

Defendant Hersl is charged in Count One of the indictment, racketeering conspiracy, for his involvement in robberies and extortions once he joined the Gun Trace Task Force (GTTF). In Count Two he is charged with substantive racketeering violations for those episodes and for two robberies he alone perpetrated before he joined the GTTF.  In the Indictment, Defendant Hersl is alleged to have directly participated in more robberies and extortions than any of his co-defendants.  Defendant Hersl is alleged to have directly participated in Racketeering Acts 1, 2, 5, 7, 8, 9, and 10.

Defendant Hersl is the only defendant charged in Racketeering Acts One and Two.  As alleged Racketeering Act One in the Indictment,

> On November 27, 2015, Detective Hersl and Detective 1 and Sergeant 1, acting in their capacity as police officers, arrested H.T.

> Detective 1 searched H.T. and seized approximately $530 from him and a paystub.  H.T. had earned the money from his job as an HVAC engineer.

> Detective 1 turned the money over to Hersl.

> Hersl only submitted $218 of the $530 that was taken from H.T. to the BPD.

> To conceal his illegal conduct, on November 27, 2015, Hersl authored a false Incident Report that was filed with the BPD supporting the arrest of H.T. Above his signature, Hersl certified that, "I affirm and declare that the statements above are true to the best of my knowledge."  The Incident Report falsely states that Hersl recovered $218 from H.T. when in truth and fact, $530 was taken from H.T. when he was arrested.

Indictment, Count Two, ¶¶ 4-8.  As alleged in Racketeering Act Two in the Indictment:

> On or about November 28, 2015, Detective Hersl and Sergeant. 1, acting in their capacity as police officers, arrested A.S.

Hersl seized $500 from A.S., which A.S. had earned in his job with a company that cleans office buildings overnight.  A.S. is paid in cash.  A.S. intended to use the money to pay his rent.

Hersl only submitted $218 of the $500 that he took from A.S. to BPD.

To conceal his illegal conduct, on November 27, 2016, Hersl authored a false Incident Report that was filed with the BPD supporting the arrest of A.S.  Above his signature, Hersl certified that, "I affirm and declare that the statements above are true to the best of my knowledge."   In that Incident Report, Hersl falsely stated that he recovered $218 from A.S., when in truth, Hersl had taken more than $500 from A.S.

Indictment, Count Two, ¶¶ 10-13.

As the only defendant charged in these two racketeering acts, the Defendant will not be able to blame his co-defendants or claim that they engaged in criminal conduct in these episodes without his knowledge.  Defendant Hersl stands alone on these two charges and when considered in the context of the pattern of robberies and extortions charged in the Indictment the evidence against him is overwhelming.

In terms of the nature and seriousness of the danger to any person or the community that would be posed by Defendant Hersl's release, the witnesses who will provide testimony against this Defendant and his co-defendants are terrified of them.  The witnesses fear they will be retaliated against by these defendants and other members of the BPD because they have come forward to provide evidence against police officers.  Their fears are not unfounded.  For example, when co-defendant Rayam, encountered N.H., the victim of a robbery and extortion that Hersl participated in, at a court proceeding, he told her that he was "going to get her" and that he wasn't "finished" with her."  Rayam and Gondo also discussed having a confidential source killed if he provided information to authorities about their theft.  Specifically, Rayam told Gondo that if the source ever "said anything" that he would "give out some key information,"

meaning let it be known on the street that the individual was an informant and that, as a result, "that nigger be dead."

As Magistrate Judge Gallagher found after the detention hearing in this case, there is no set of conditions that are foolproof.  In particular, Magistrate Judge Gallagher made findings that obstructive conduct can, and as the episode summarized above makes clear, did occur, using telephones and can occur by directing other police officers to take action, as occurred in the above described episode.  Placing Defendant Hersl on location monitoring does not protect the public from that kind of obstructive conduct.  If Defendant Hersl remains detained his communications will be monitored on the recorded jail phone system.  If he is released, and even if he were on location monitoring at his home, his telephone communications cannot be monitored.  The Defendant's claim that he can continue to engage in criminal conduct if incarcerated and therefore, "there is no difference between incarceration and Third Party Custody" ignores the very real limitations that custodial detention places on a Defendant.  Def. Mot. at 3.

Further, in the course of the investigation, members of the conspiracy discussed how they had received information about efforts to investigate them and about this specific investigation from other members of the BPD and by an Assistant State's Attorney in Baltimore City State's Attorney's Office.  If Defendant Hersl were released he could receive such information about on-going law enforcement efforts to investigate his conduct, and the investigation in this case is on-going, and law enforcement efforts to monitor and supervise him.

Defendant Hersl, because of his law enforcement training, poses unique risks for Pretrial Services.  He is experienced in law enforcement techniques and has shown in the course of the investigation, along with his co-defendants, knowledge of counter-law enforcement techniques

including techniques to evade surveillance.  The Defendant engaged in the conduct charged by

the Grand Jury while under the supervision of the BPD, the Internal Investigations Division (IID)

of the BPD and during the extensive investigation into the BPD conducted by the U.S.

Department of Justice's Civil Rights Division.  These law enforcement authorities and

investigators were not able to detect the Defendant's conduct.  He has demonstrated that he does

not respect the authority of law enforcement or the courts.  He has shown that he is willing to lie

to various actors in the criminal justice.  Against this experience, the Defendant offers only the

forward-looking assertion that he will now respect the judicial system he has previously

undermined and will now provide truthful information about his own conduct which he has lied

about it in the past.    There are no set of conditions that can reasonably assure that the Defendant

will not engage in obstruction and thus endanger the community.  Therefore, he should be

detained pending trial in this matter.


Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By:   _____
Leo J. Wise
Derek Hines
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800


Date:   March 6, 2017