## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. 1:17-cr-106-006** |
| | § | |
| **MARCUS TAYLOR** | § | |


## MARCUS TAYLOR'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS AMENDED § 2255 MOTION

Brent E. Newton
Maryland Attorney # 2002060016
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
brentevannewton@gmail.com

**Appointed Counsel for**
**Marcus Taylor**

## **<u>TABLE OF CONTENTS</u>**

I.  Points in Reply Concerning Insufficient-Evidence Claims &
Related Ineffective-Assistance Claims…………………………....4

A. Mr. Taylor's Insufficient-Evidence Claims Are Viable Under
    the Actual-Innocence Exception…………………………......4

B. Mr. Taylor Is Actually Innocent of the Charges in Counts
    One, Two, and Three……………………………………....7

C. Mr. Taylor's Trial and Appellate Counsel Provided Ineffective
    Assistance of Counsel by Failing to Challenge the Sufficiency of the
    vidence Supporting the Jury's Convictions………………………19

II.  Points in Reply Concerning Remaining Ineffective-Assistance
Allegations Related to Trial Counsel……………..…………………..20

    A. Trial Counsel Performed Deficiently by Failing to Offer
        Evidence that Hendrix and Ward Lied Under Oath about the
        Purported "Safe Reenactment" Video-Recording (Which
        Would Have Destroyed Their Credibility)…………………...22

    B. Trial Counsel Performed Deficiently by Failing to Offer
        Evidence that Hendrix Lied Under Oath about the Sequence of
        Events Occurring on March 22 & 23, 2016…………………..23

    C. Trial Counsel Performed Deficiently by Failing to Impeach
        Ward with Significant Prior Inconsistent Statements that He
        Made to the Trial Prosecutors and FBI Agent Before Trial….24

    D. Trial Counsel Performed Deficiently by Failing to Impeach
        Hendrix with Inconsistent Statements Given to the Trial
        Prosecutors and FBI Agent Before Trial……………………..24

    E. Trial Counsel Performed Deficiently by Failing to Offer
        Evidence that Mr. Taylor's House Did Not Have a Basement
        (Which Would Have Contradicted Ward's Testimony)…...…29

F.  Trial Counsel Performed Deficiently by Failing to Offer Evidence that Rayam Lied Under Oath about What He Had Said in a Recorded Conversation About the Robbery of Sergio Summerville (Which Would Have Destroyed Rayam's Credibility)……………………..30

G.  Trial Counsel Performed Deficiently by Failing to Impeach Shawn Whiting with His Grand Jury Testimony that a "Hispanic" Police Officer Took Custody of Whiting's Money in His Home………......31

H.  Trial Counsel Performed Deficiently by Failing to Offer Evidence that Whiting's Complaint Against the Officers (including Mr. Taylor) Filed with the Internal Affairs Division Was Found to Be Unsubstantiated……………………………………….…………….32

I.  Trial Counsel Performed Deficiently by Failing to Impeach Keona Holloway with a Recorded Jail Call Between Her and Oreese Stevenson in Which She Acknowledged Attempting to Remove Contraband from Stevenson's Home Before Police Officers Arrived There……………………………………….………....…..33

J.  Trial Counsel Performed Deficiently by Failing to Offer Evidence that Mr. Taylor Received a Substantial Amount of Money in Workers' Compensation Benefits and From Other Legitimate Sources During the Relevant Time Period (Which Would Have Explained How He Could Afford to Purchase a New Deck for His Home)…………….34

K.  Trial Counsel Performed Deficiently by Failing to Offer Evidence Raising a Reasonable Doubt About Whether Mr. Taylor Engaged in Time-and-Attendance Fraud………………………………………34

L.  Mr. Taylor's Trial Counsel Provided Ineffective Assistance by Failing to Object to the Prosecutor's Argument that Mr. Taylor Was Guilty of Racketeering Act Eight and Count Three Based on an Alleged Robbery of Keona Holloway and also by Failing to Ask for Jury Instructions Limiting the Jury's Consideration to Oreese Stevenson as the Victim………………………………………………………………35

M.  The Acts and Omissions Constituting Deficient Performance, When
Considered Cumulatively, Prejudiced Mr. Taylor…………………..36

Conclusion……..…………………………..…………………………….37

Certificate of Service………………..…………………………………39

\*\*\*

The defendant, Marcus Taylor, submits this reply to the government's response in opposition to his amended § 2255 motion.

# I.
# Points in Reply Concerning Insufficient-Evidence Claims & Related Ineffective-Assistance Claims

## A. Mr. Taylor's Insufficient-Evidence Claims Are Viable Under the Actual-Innocence Exception.

The government contends that Mr. Taylor's insufficient-evidence claims are procedurally defaulted because they were not raised on direct appeal and do not fall within the "actual innocence" exception to the procedural-default rule. Government's Response, at 15-20.

Initially, the government errs by contending (three separate times) that the evidence must show that Mr. Taylor is actually innocent by "clear and convincing evidence."  Government's Response, at 15-16, 19, 21 (citing *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999)).  Although the Fourth Circuit in 1999 did state that the actual-innocence exception requires a showing by "clear and convincing exception," that precedent is no longer valid.  In support of that erroneous

holding, the Fourth Circuit cited the Supreme Court's decision in *Murry v. Carrier*, 477 U.S. 478, 496 (1986)).  Yet the Supreme Court in *Murray* did *not* hold that the "clear and convincing evidence" standard applies – not on page 496 or on any other page of that decision.  Instead, *Carrier* held that a defendant need only prove his actual innocence under the preponderance standard.  *Id.* at 496 (requiring the defendant to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent").  Citing page 496 of *Carrier*, the Supreme Court subsequently held that, in order to avoid a procedural default, a defendant need only show his actual innocence by a preponderance of the evidence and not by clear and convincing evidence.  *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995) (adopting "more likely than not" standard rather than "clear and convincing evidence" standard for an actual-innocence "gateway" to permit a court to address a procedurally-defaulted claim).  After *Schlup*, the Fourth Circuit has held that the preponderance standard applies to the actual-innocence exception to the procedural-default doctrine.  *Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

The government next contends that the "actual innocence" exception only applies to constitutional claims based on "new" evidence.  Government's Response, at 18.  Although in 1995 in *Schlup* the Supreme Court did speak of "new evidence" – because Schlup's procedurally-defaulted claim was based on new evidence – the Court subsequently has applied the actual-innocence exception to a procedurally

defaulted constitutional claim challenging a defendant's conviction in a § 2255 motion even if it is not based on "new" evidence. *United States v. Bousley*, 523 U.S. 614, 623-24 (1998). In *Bousley*, the Court permitted the defendant to raise a due-process claim for the first time in a § 2255 motion solely challenging his conviction on *legal* grounds – i.e., that his guilty plea was involuntary – without offering any "new" evidence. *See id.* at 618-19. Since *Bousley*, a federal defendant convicted *at trial* also may challenge his conviction on *legal* grounds for the first time in a § 2255 motion – without offering any "new" evidence – if he proves that he is "actually innocent" based on the prosecution's own evidence (i.e., "no reasonable juror would have convicted him"[1]) based on an intervening change in the governing case law interpreting the statute of conviction. *See, e.g.*, *United States v. Leopard*, 170 F.3d 1013, 1016 (10th Cir. 1999); *United States v. Sorrells*, 145 F.3d 744, 750 n.4 (5th Cir. 1998).

Mr. Taylor's insufficient-evidence claim is not based on any "new" evidence of his innocence[2] or an intervening change in the case law occurring since his

---

[1] *Schlup*, 513 U.S. at 327 (noting "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him").

[2] A claim of insufficient evidence supporting a defendant's conviction obviously cannot be based on "new" evidence. It necessarily is based on what evidence was offered at trial.

In contrast, Mr. Taylor's claims of ineffective assistance by his trial counsel, Mr. Taylor has pointed to a significant amount of new evidence that his trial counsel failed to use at trial. Yet he does not rely on that evidence as establishing his innocence by a preponderance of the evidence under actual-innocence exception. He instead relies on that new evidence to show "prejudice"

convictions became final on direct appeal.  However, logically, the fact that he does not rely on intervening case or new evidence law should be irrelevant under the actual-innocence exception, at least when no court has previously ruled on his insufficient-evidence claims (because they were not properly raised in a motion for judgment of acquittal or in an appellate brief).  If a federal defendant is actually innocent based on the prosecution's evidence at trial, then he should be entitled to relief under § 2255, regardless of whether there is any new evidence or any intervening change in case law.  Under no circumstances should an actually innocent defendant have his unconstitutional convictions left intact.

As discussed in Mr. Taylor's amended § 2255 motion, in assessing Mr. Taylor's actual-innocence arguments, this Court must consider only the charges of which he was convicted and not consider whether he is guilty of any other, uncharged offenses.  *See Vosgien v. Persson*, 742 F.3d 1131, 1135 (9th Cir. 2014) (". . . Vosgien need not demonstrate that he was actually innocent of *any* criminal wrongdoing.  He need only demonstrate that he was actually innocent of compelling prostitution, the counts under which was convicted.") (discussing *Bousley*); *see also United States v. Davies*, 394 F.3d 182, 194 n.9 (3d Cir. 2005).

### B. Mr. Taylor Is Actually Innocent of the Charges in Counts One, Two, and Three.

under *Strickland v. Washington*, 466 U.S. 668 (1984).  The evidence of Mr. Taylor's actual innocence was offered at trial.

1. <u>Count One</u>

The government first contends that Mr. Taylor is not actually innocent of Racketeering Act Eight (supporting Mr. Taylor's conviction of the RICO conspiracy charge in Count One) because the evidence at trial shows Mr. Taylor's guilt of conspiring to rob, and actually robbing, Demetrius Brown (in Oreese Stevenson's vehicle) and Keona Holloway (at Stevenson's house).  Government's Response, at 22-25.  This argument lacks merit, as discussed in Mr. Taylor's amended § 2255 motion.  *See* ECF No. 846, at 17-26.  Neither Brown nor Holloway were listed as victims in the superseding indictment.  Only Oreese Stevenson was.  Therefore, this Court's actual-innocence analysis should be limited to asking whether, based on the incontrovertible evidence that (1) Stevenson did not possess any legal interest in Brown's money taken by the detectives and (2) Stevenson was not present when the detectives took the money from his basement, Mr. Taylor is actually innocent of robbing him (or conspiring to rob him).

The government errs by contending that the superseding indictment's charge concerning Racketeering Act Eight is not limited to Stevenson as the victim and, instead, includes Brown and Holloway.  Government's Response, at 22 & n.2.  A fair reading of the relevant portion of the superseding indictment clearly shows that it alleges Stevenson as the sole victim of the alleged robberies occurring in his

vehicle and later in his home.  *See* ECF No. 137, at 10.  The relevant portion is set

forth below:

**March 22, 2016, Robbery / Extortion of O.S.**

27.     On or about March 22, 2016, Sergeant JENKINS and Detectives TAYLOR, E.H., and M.W., acting in their capacity as police officers, conducted a traffic stop and arrested O.S. The defendants seized suspected narcotics and $21,500 from O.S.  JENKINS only submitted $15,000 of the $21,500 that was taken from O.S. and kept the rest for himself.  At the time of the arrest, the defendants also took O.S.'s house key and looked at his driver's license which identified the location of O.S.'s residence.

28.     To conceal his illegal conduct, on or about March 22, 2016, JENKINS approved an incident report, authored by E.H., which falsely stated that only $15,000 had been seized from O.S., when in fact, $21,500 had been seized from O.S.  Above his signature, JENKINS certified that, "I affirm and declare that the statements above are true to the best of my knowledge."  JENKINS did not submit the $6,500 he stole from O.S. to the BPD.

29.     Following the arrest of O.S., JENKINS, TAYLOR, E.H., and M.W. entered O.S.'s residence.  JENKINS, TAYLOR, E.H. and M.W. stole money, including approximately $200,000 from a safe they opened and from two bags they seized, and property, including a Breitling men's wristwatch valued at $4,000 from the location.

30.     After JENKINS had emptied the safe he put $100,000 back into it and had the other members of the GTTF create a video, on TAYLOR's cellular telephone, that purported to show them opening the safe and finding the money.

31.     After the search, JENKINS, TAYLOR, E.H. and M.W. went to TAYLOR's house.  In TAYLOR's basement, JENKINS gave TAYLOR, E.H and M.W., at least $20,000 each from the money that had been stolen from O.S.  JENKINS kept the rest of the money for himself.

10

Therefore, Mr. Taylor is actually innocent of Racketeering Act Eight, *as*

*charged in the indictment*.  As explained above, in assessing actual innocence, this

Court is limited to considering what Mr. Taylor was charged with and convicted of

– not any uncharged offense, even one related to the charged offenses.

The government next erroneously contends that, under Maryland law (which governs the allegations in Racketeering Act Eight), Mr. Taylor is guilty of robbing Stevenson even though the record shows that the money in the vehicle belonged to Brown at the time of the alleged robbery.  Government's Response, at 24.  The government first claims that Judge Blake's jury instructions somehow trump Maryland law.  *Id.*  Of course, Judge Blake's jury instructions could not change the requirements of Maryland law or the manner in which Racketeering Act Eight was charged in the superseding indictment.

Realizing that Maryland law controls this Court's analysis of Racketeering Act Eight, the government also makes the *ipse dixit* argument that, at the time that officers took the money from the vehicle, "Stevenson had a legal interest in the funds for the drugs that he was selling to Brown."  *Id.*  The government has cited no Maryland law for that proposition – because there is none.  It is axiomatic that a seller does not possess any contractual right to or legal interest in the potential purchase money that a *prospective* buyer has in the seller's property *before* the sale is consummated by the parties having a "meeting of the minds" about all essential terms of the proposed sale.  *See Cochran v. Norkunas*, 919 A.2d 700, 713 (Md. 2007) ("Acceptance of an offer is requisite to contract formation, and common to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation.").  Here, the undisputed evidence

at trial was that there had been no "meeting of the minds" between Brown (the prospective buyer) and Stevenson (the seller) concerning the sale of the drugs at the time of the alleged robbery of the money by the detectives.

Finally, the government's reliance on the Fourth Circuit's decision on Mr. Taylor's direct appeal as "law of the case" is untenable. *See* Government's Response, at 23. The insufficient-evidence argument made by Mr. Taylor in his amended § 2255 motion regarding Racketeering Act Eight – based on Maryland law – was not raised in the briefs or decided on direct appeal. The Fourth Circuit only addressed the Hobbs Act charge in Count Three (which did not turn on Maryland law), not the RICO charges in Counts One and Two. Furthermore, as discussed in Mr. Taylor's amended § 2255 motion, the Fourth Circuit's discussion of the sufficiency of the evidence concerning the Hobbs Act robbery – which assumed Brown was the victim charged in Count Three – was "dead wrong" under applicable precedent and, thus, is not binding under the law-of-the-case doctrine. ECF No. 137, at 24, 37.

2. Count Two

The government contends that there is sufficient evidence supporting the RICO charge in Count Two. First, the government contends that the three wire-fraud racketeering acts may be counted separately. For the reasons discussed in Mr. Taylor's amended § 2255 motion, under well-established Fourth Circuit precedent

the three wire fraud racketeering acts constitute a single racketeering act.  ECF No.

137, at 27-30, citing, *e.g.*, *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225,

238 (4th Cir. 2000).

     In support of its erroneous argument, the government cites *Menasco, Inc. v.*

*Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989), and *Brasko v. Howard Bank*, No.

1:20-CV-03489-SAG, 2021 WL 1662464 (D. Md. Apr. 27, 2021).  Government's

Response, at 26-27.  Neither case supports the government's position.  Indeed, they

each support Mr. Taylor's argument.  In *Menasco*, the Fourth Circuit stated that the

"plaintiffs' allegations fail to satisfy the continuity prong of RICO's pattern

requirement" because "Defendants' actions were narrowly directed towards a single

fraudulent goal" involving "one set of victims," and fraudulent activity "took place

over approximately one year."  *Menasco, Inc.*, 886 F.2d at 684.  Those words are

equally applicable to the wire-fraud racketeering acts charged in Count Two.  ECF

No. 137, at 17-20, 52-53.  The alleged time-and-attendance fraud charged as

racketeering acts in Count Two was directed toward a single fraudulent goal,

involved a single set of victims, and took place during a limited time period.

     In *Brasko*, this Court dealt with a clearly different type of recurring fraud

scheme with multiple discrete acts and 190,000 different victims:

> Here, the huge volume of mailings soliciting new borrowers across the
> country, as well as the lengthy time period over which these mailings
> were sent, leads the Court to conclude that such mailings are more than
> mere "garden-variety fraud claims" and are mailings that constitute "a

more serious scope of activity." *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). The allegations here involve 190,000 mailings sent over the course of two years to recipients across the nation. ECF 1 ¶¶ 18, 35, 65, 74. The scheme allegedly implicated multiple First Mariner bank branches and at least 22 First Mariner employees. Id. ¶¶ 20, 25, 70. Plaintiffs identify at least 264 affected loans assigned and referred from First Mariner to All Star, as well as tens of thousands of dollars in kickbacks paid from All Star to First Mariner in return, with the borrowers on these loans comprising hundreds of alleged victims. Id. ¶¶ 26, 29, 30, 33-34. This is far removed from the "garden-variety" scenarios contemplated in *Al-Abood*, where the "narrow focus of the scheme" was "essentially a dispute between formerly close family friends" and involved "commonplace predicate acts." *See* 217 F.3d at 238.

*Brasko*, 2021 WL 1662464, at *6.

Therefore, this Court should find that at most a single wire-fraud racketeering act exists. The Fourth Circuit's decision on Mr. Taylor's first direct appeal does not foreclose this ruling for two reasons. First, to the extent that the Fourth Circuit held that the multiple acts of time-and-attendance fraud constitute separate racketeering acts, that holding is clearly erroneous under prior, binding precedent and, thus, does not bind this Court under the law-of-the-case doctrine. ECF No. 846, at 29-30. Second, because the parties' briefs on direct appeal did not raise the issue of whether the multiple acts of wire fraud charged in Count Two can be treated as separate racketeering acts under the RICO statute (and, indeed, incorrectly assumed that they could be), the Fourth Circuit's decision is not "law of the case" on that point. Only "those matters that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed [by the

court] are deemed to have been decided tacitly or implicitly, and their disposition is law of the case." *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001). It is well established that, when an appellate court renders a decision based on an undisputed "antecedent proposition" of law, the court's assumption of the correctness of that legal proposition is not binding precedent in a future case when that proposition is challenged as incorrect. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990).

This Court also should reject the government's argument that *conspiracy* to commit robbery under Maryland law is a racketeering act under 18 U.S.C. § 1961(1). Government's Response, at 28-29. As an initial matter, although the government cites non-Fourth Circuit precedent holding that the "categorical approach" does not apply to § 1961(1) and that state conspiracy offenses qualify as predicate offenses under that statute,[3] the government fails to address a Supreme Court decision that strongly supports Mr. Taylor's position. *See Scheidler v. Nat'l Org. for Women*, 537 U.S. 393, 409 (2003) (holding that § 1961(1)'s language an "act . . . involving . . . extortion" requires that a state extortion offense must fall "within a generic definition of extortion" to be considered a racketeering act); *id.* (holding that "for a state

---

[3] The government also fails to address *Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir. 1991), which requires a narrow interpretation of RICO in criminal (as opposed to civil) cases. *Faircloth* takes a different approach from the other circuit courts concerning how to interpret the RICO statute in criminal cases.

offense to be an 'act or threat involving . . . extortion, . . . which is chargeable under State law,' as RICO requires, *see* 18 U.S.C. § 1961(1), the conduct must be capable of being generically classified as extortionate"). *Scheidler*'s reference to "generic" extortion clearly shows that the Court applied the "categorical" approach to § 1961(1). *See United States v. Franklin*, 904 F.3d 793, 801 (9th Cir. 2018) (referring to the approach in *Scheidler* as a "similar approach" to the "categorical approach" used to determine whether prior convictions qualify as predicate offenses), *overruled on other grounds by Shular v. United States*, 589 U.S. 154 (2020).

     *Scheidler* logically applies to all state offenses set forth in § 1961(1) – including "robbery" – and not merely "extortion" offenses. Because conspiracy to commit robbery under Maryland law is not "generic" robbery (in that it does not require an overt act to commit the offense), it fails to qualify as an "act . . . involving . . . robbery." *See United States v. McCollum*, 885 F.3d 300, 308 (4th Cir. 2018).

     The government further errs in its response to Mr. Taylor's argument that, even assuming *arguendo* that such a "generic" approach to interpreting § 1961(1)'s definition of "robbery" were not required, the term "involves" as used in that statute defines a type of criminal conduct that "necessarily entails" or "necessarily involves" such conduct. *See Kawashima v. Holder*, 565 U.S. 478, 484 (2012) (discussing the meaning of "involve"); *accord Shular*, 589 U.S. at 160-62. Because conspiracy to commit robbery under Maryland law merely requires an *agreement* to

commit robbery, with no action required, the mere conspiratorial agreement does not "involve" (i.e., necessarily require or entail) any conduct constituting robbery. Furthermore, because the jury explicitly *acquitted* Mr. Taylor of actually committing robbery of Whiting and Summerville, the jury's narrow findings of a mere agreement to commit robbery cannot qualify as a racketeering act ("an act . . . involving . . . robbery") under § 1961(1). Therefore, Mr. Taylor is actually innocent of – and thus there necessarily is insufficient evidence that Mr. Taylor committed – the RICO offense charged in Count Two.

    3. <u>Count Three</u>

The government contends that there is sufficient evidence of the Hobbs Act charge in Count Three. Government's Response, at 30-32. Rather than focusing on the language of Count Three – which is what governs this Court's legal analysis[4] – the government instead focuses on language in Judge Blake's jury instructions. Government's Response, at 30-31.

    Even assuming *arguendo* that the jury instructions are relevant, Judge Blake

---

[4] *See United States v. Chambers*, 408 F.3d 237, 240-44, 247 & n.6 (5th Cir. 2004) (holding that an appellate court cannot find sufficient evidence supporting a conviction when that evidence proves a different charge from the one set forth in the indictment); *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994) ("If . . . an allegation [in the indictment] is either necessary to or is made essential to the offense as charged [by being specifically pleaded], failure to support it with appropriate proof at trial, even if evidence does establish what would have been an adequate replacement offense if charged [but was not so charged], is fatal."); *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999) (favorably citing *Willoughby*).

did not instruct the jury that it could convict Mr. Taylor of taking money from Demetrius Brown (in the presence of Stevenson) or taking Stevenson's money (in the presence of Keona Holloway but not in Stevenson's presence). The government refers to the passage at ECF No. 474, at 66, in which Judge Blake stated: "The violence does not have to be directed at the person whose property was taken. The use or threat of force or violence might be aimed at a third person." *Id.*

That passage would allow for a conviction of a Hobbs Act robbery based on (1) taking the named victim's property *from his person or in his presence* while (2) using force against a third person.[5] Yet, in this case, the sole named victim in Count Three was Oreese Stevenson, not Brown or Holloway. ECF No. 137, at 54. Count Three specifically incorporated ¶¶ 27 through 32 in Count One – the racketeering act related to the alleged robbery of Stevenson (charged in violation of Maryland law). Those paragraphs specifically described two alleged robberies: (1) robbery of $6,500 (during the traffic stop on the afternoon of March 22, 2016) and (2) robbery of "approximately $200,000" (¶ 29) from a safe in Stevenson's home (later in the

---

[5] Section 1951 defines "robbery" as "the unlawful taking or obtaining of *personal property [of the victim] from the person or in the presence of [the victim],* against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1) (emphasis added); *see also Taylor v. United States,* 596 U.S. 845, 850 (2022). The statute clearly requires, for a valid conviction, a defendant to take the personal property *of the victim* named in the indictment from "the person or in the presence of" that named victim. Even if the "force" element can be satisfied by proof of a threat or violence directed against a third person (such as Brown or Holloway), the personal property in question must have been on the "person" of Stevenson or at least have been in his possession or owned by him and taken from his "presence." Under the incontrovertible evidence at trial, Stevenson – the sole named victim in the indictment – did not own or possess (or have any legal interest) in Brown's money. Nor was Stevenson present at the scene when the money was taken from his home.

day on March 22).  Therefore, Count Three's explicit reference to "approximately $200,000" (ECF No. 137, at 54) can only fairly be read to refer to the money taken from the safe in Stevenson's home as opposed to the $6,500 taken from Demetrius Brown when he and Stevenson were inside Stevenson's vehicle.  Because Mr. Taylor did not take the "approximately $200,000" *from Stevenson's person or in his presence* (as Stevenson then was in custody several miles away), Mr. Taylor did not commit the Hobbs Act robbery *as charged in Count Three*.  In addition, as discussed in Mr. Taylor's amended § 2255 motion, when the $200,000 was taken, Holloway was voluntarily sitting outside Stevenson's house in her car, so she could not be the third person subject to force or violence (even if Stevenson's lack of presence at the house did not pose a problem for the prosecution's case).

To the extent that the Fourth Circuit relied on the purported robbery of Brown and Stevenson in Stevenson's vehicle, the Fourth Circuit clearly erred (as the result of ineffective assistance of appellate counsel, as discussed below).  Count Three did not charge a robbery of the money taken from Stevenson's vehicle; it was limited to the $200,000 taken from Stevenson's home.  And, even assuming *arguendo* that Count Three could be based on the alleged robbery of the $6,500 taken from Stevenson's vehicle (as opposed to the approximately $200,000 taken from his home), Stevenson could not legally be the victim of that robbery; Brown was the only possible victim, as he was the only one with any legal interest in, or possession

of, the cash at the time it was taken.  Therefore, the Fourth Circuit's decision is not binding under the law-of-the-case doctrine.

### C. Mr. Taylor's Trial and Appellate Counsel Provided Ineffective Assistance of Counsel by Failing to Challenge the Sufficiency of the Evidence Supporting the Jury's Convictions.

As discussed in Mr. Taylor's amended § 2255 motion, (1) the lack of *any* insufficient-evidence arguments made by trial counsel within the time period to file a post-trial Rule 29(c) motion for judgment of acquittal and (2) appellate counsel's decision to include only meritless insufficient-evidence arguments both constituted ineffective assistance of counsel.  The legal landscape at the time of Mr. Taylor's trial and first direct appeal fully supported each of the meritorious insufficient-evidence arguments discussed above.  Therefore, Mr. Taylor is entitled to relief under § 2255.  In addition, appellate counsel's ineffectiveness constitutes "cause" to permit Mr. Taylor to raise the meritorious insufficient-evidence claims for the first time in this § 2255 proceeding.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("Ineffective assistance of counsel . . . is cause for a procedural default.").

## II.

## Points in Reply Concerning Remaining Ineffective-Assistance Allegations Related to Trial Counsel

The government contends that each of the remaining claims of deficient performance by Mr. Taylor's trial counsel lack merit and, alternatively, that even if deficient performance occurred, those individual acts or omissions did not "prejudice" Mr. Taylor within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984).  Government's Response, at 34-46.  The government errs.

At the outset, Mr. Taylor will address a flaw occurring throughout the government's response concerning the "prejudice" prong of *Strickland*.  Although it briefly argues that 13 instances of deficient performance generally did not prejudice Mr. Taylor, the government proceeds to address the supposed lack of prejudice concerning each allegation of deficient performance individually rather than cumulatively.  *See* Government's Response, at 36-46.  Rather than analyzing whether each discrete act of deficient performance is prejudicial, this Court should analyze prejudice *cumulatively* – i.e., considering the cumulative prejudicial effect of all acts and omissions constituting deficient performance.  *See Strickland*, 466 U.S. at 687 ("The defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (emphasis added); *id.* at 694 ("The defendant must show that there is a reasonable probability that, but for

counsel's unprofessional *errors*, the result of the proceeding would have been different.") (emphasis added); *id.* at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the *errors*, the factfinder would have had a reasonable doubt respecting guilt.") (emphasis added); *cf. Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) ("materiality" under *Brady v. Maryland*, 373 U.S. 83 (1963), must be assessed *cumulatively* with respect to all items of nondisclosed evidence); *id.* at 434 (noting *Strickland* "prejudice" and *Brady* "materiality" are identical standards).[6]

    With respect to the 13 allegations of deficient performance set forth in Mr. Taylor's amended § 2255 motion, the government contends that every single act or omission was non-deficient under *Strickland*'s standard of attorney performance. Government's Response, at 34-46.  The government argues that all the acts or omissions identified by Mr. Taylor as the basis for his ineffective-assistance claim were "isolated" and "trivial."  *Id.* at 36.  Mr. Taylor will address each of the 13 instances below.  They are by no means isolated or trivial.  Especially when considered holistically, the 13 instances of deficient performance clearly prejudiced Mr. Taylor within the meaning of *Strickland*.  If counsel had performed effectively,

---

[6] *See also United States v. Russell*, 34 Fed. App'x 927, 927-28 (4th Cir. 2002) (citing *Moore v. Reynolds,* 153 F.3d 1086, 1113 (10th Cir. 1998), for the proposition that cumulative-error analysis applies to a *Strickland* "prejudice" inquiry when there are two or more actual instances of deficient performance).

Mr. Taylor would have had a strong defense at trial – by undermining the credibility of essential prosecution witnessed and challenging the integrity of the prosecution's case.

### A. Trial Counsel Performed Deficiently by Failing to Offer Evidence that Hendrix and Ward Lied Under Oath about the Purported "Safe Reenactment" Video-Recording (Which Would Have Destroyed Their Credibility).

As an initial matter, the government contends that the declaration from the investigator attached to Mr. Taylor's amended § 2255 motion is "inadmissible" as hearsay.  Government's Response, at 37.  The government errs.  The Federal Rules of Evidence concerning hearsay are inapplicable to affidavits or declarations filed by a defendant in support of his § 2255 proceeding.  *See Cooper v. United States*, 367 F. Supp.3d 780, 789 (E.D. Tenn. 2019) (citing cases).[7]

The investigator's affidavit was only offered to show that Mr. Taylor's trial counsel had a basis to cross-examine former detectives who testified about the supposed safe-cracking "reenactment" video-recording.   At the requested evidentiary hearing, undersigned counsel for Mr. Taylor will show the manner in which such an effective cross-examination could have occurred at trial (through his questioning of former detectives Hendrix and Ward about the supposed

---

[7] Mr. Taylor does not contend that the investigator should have been called as an expert witness at trial.  He merely offers the investigator's declaration to show that a basis existed to cross-examine the two former detectives, Hendrix and Ward, who testified about the supposed safe-cracking "reenactment" video-recording.

"reenactment").  *See Cooper*, 367 F. Supp.3d at 789 ("[D]espite the [government's] hearsay objection, the Court finds that it is appropriate to consider the affidavits in this case in connection with its decision as to whether Plaintiff [the § 2255 movant] is entitled to an evidentiary hearing.  *See Valentine v. United States*, 488 F.3d 325, 334 (6th Cir. 2007) (. . . noting that Petitioner's 'burden to show his right to a hearing is significantly lower than his burden to show he is entitled to § 2255 relief'")).

Trial counsel performed deficiently by failing to cast doubt on the two former detectives' testimony about the supposed – but highly implausible – safe-cracking "reenactment."  Such doubt, combined with the other possible impeachment of the two men (discussed below), likely would have raised at least a reasonable doubt about whether the prosecution had proved Taylor's knowing (i.e., criminal) involvement in the officers' theft of the money from Stevenson's house.

### B. Trial Counsel Performed Deficiently by Failing to Offer Evidence that Hendrix Lied Under Oath about the Sequence of Events Occurring on March 22 & 23, 2016.

The government contends that the chain-of-custody form – showing that Hendrix submitted the money seized from Stevenson's vehicle to the evidence vault at 9:00 p.m. on March 22, 2016 – was merely a "clerical error" that did not provide Mr. Taylor's trial counsel with any basis to impeach Hendrix's credibility. Government's Response, at 38.  The government is wrong.  To begin with, there is absolutely no proof offered by the government that the 9:00 p.m. time stamp was a

"clerical error."  The 9:00 p.m. time stamp significantly contradicts Hendrix's sworn

testimony about the sequence of events on March 22 and 23, 2016.  Mr. Taylor's

trial counsel could have used that document – along with other evidence – to show

that Hendrix lacked any credibility in his claim that Mr. Taylor was a knowing

participant in the theft of money taken from Stevenson's vehicle or home.

> **C. Trial Counsel Performed Deficiently by Failing to Impeach Ward with Significant Prior Inconsistent Statements that He Made to the Trial Prosecutors and FBI Agent Before Trial.**

> **D. Trial Counsel Performed Deficiently by Failing to Impeach Hendrix with Inconsistent Statements Given to the Trial Prosecutors and FBI Agent Before Trial.**

The government responded to these two allegations of deficient performance

in a single portion of its response, so Mr. Taylor will reply in the same manner.

The government first contends that Mr. Taylor's trial counsel did not perform

deficiently by failing to cross-examine Ward and Hendrix about their pretrial

statements given to agents and the trial prosecutors, which were flatly inconsistent

with the direct-examination testimony of both Ward and Hendrix about the

purported "ruse" or "hoax" at Stevenson's house (in order to create probable cause

to permit a warrantless entry into and search of Stevenson's home).[8]  Government's

Response, at 39-40.  Again, the government errs.

In Ward's April 17, 2017 statement (as recounted by an FBI agent), Ward

stated:

> JENKINS sent Sergeant JORDAN MOORE to sit on STEVENSON's
> house and *while there he [i.e., Moore] saw a guy trying to get in[to]
> [Stevenson's house]*. JENKINS, WARD, TAYLOR, and HENDRIX
> raced across from the Northwest to the Northeast to get to the house
> and when they got there TAYLOR went to the back [of Stevenson's
> house] and the rest of them knocked on the neighbor's door.  An older
> black woman wearing glasses came to the door and while talking with
> her *TAYLOR called out on the radio that someone was running from
> the back of the house*. JENKINS and HENDRIX ran toward TAYLOR
> and WARD stayed with the neighbor. *They weren't able to catch the
> person who ran from the back of the house so they all returned to the
> neighbor's house*.  TAYLOR was not sure if the person came out of the
> house but was 100% [certain] that they were in the backyard.  TAYLOR
> estimated the age of the person to be between 18 and 25 JENKINS
> wanted to get the neighbor's statements recorded.   WARD does not
> recall who recorded her statements.

**Amended § 2255 Motion, Exhibit C** (4/17/2017 at page 14) (emphasis added).

That statement entirely contradicts Ward's later claim of a "ruse" to give the

officers a basis to enter Stevenson's house without a warrant.  The government's

attempt to rely on a single out-of-context sentence in the next paragraph of the

---

[8] For instance, Ward testified that: "So Jenkins came up with this plan. He told Taylor to go around
the back to make it seem like someone was coming out of the house and he chased 'em and he lost
'em on a foot pursuit to make it seem like exigent circumstances so that we can go in the house
and hold the house until we got the search warrant." ECF No. 464, at 149.

report[9] – "JENKINS said that the person had come out of the back of the house and even at the time WARD thought that JENKINS was saying it so he would have probable cause to get a warrant." – in support of the supposed "ruse" is entirely meritless. Government's Response, at 39. That sentence did not say anything about a "ruse"; it referred to Jenkins' belief that probable cause existed to enter the house (based on what Moore and Taylor had stated about what they actually had seen). And, significantly, the prior paragraph provided a detailed statement about *actual events* that were entirely inconsistent with a "ruse."

Similarly, in Hendrix's May 5, 2017 statement (as recounted by an FBI agent), he told the agents and prosecutors:

> When they got to the residence TAYLOR went around back and either shouted or called out on the radio that there was a kid that came out of the back. The kid ran and they [the detectives] weren't able to catch him. They then went into the house to clear it and make sure no one else was there.

---

[9] That paragraph reads:

> JENKINS had taken STEVENSON's keys and used them to open the door JENKINS immediately went upstairs to STEVENSON's bedroom which was to the right WARD went to the other two rooms which were a teenager's bedroom and a little kid's bedroom JENKINS then went into the basement and then called the rest of them down there When WARD got downstairs JENKINS was holding a kilogram and said something to the effect of, "When was the last time you saw something like this." There was a safe, guns, and duct taped kilograms. Everything was in a storage closet under the stairs. JENKINS went out to the car and when he came back inside he said that they needed to get a search warrant. JENKINS said that the person had come out of the back of the house and even at the time WARD thought that JENKINS was saying it so he would have probable cause to get a warrant.

**Appendix C** (4/17/2017 statement, at page 14).

26

**Amended § 2255 Motion, Exhibit D** (5/5/2017 statement, at page 2).  This also clearly was not a description of a "ruse."  Like Ward, Hendrix clearly recounted *what actually occurred*.

> The first mention of the events supposedly being a "ruse" or "hoax" was at trial, when the prosecutor question Hendrix and Ward.   Ward testified that:

> So Jenkins came up with this plan.  He told Taylor to go around the back to make it seem like someone was coming out of the house and he chased 'em and he lost 'em on a foot pursuit to make it seem like exigent circumstances so that we can go in the house and hold the house until we got the search warrant. . . .  There was a plan that Jenkins made up just so we can get inside of the house. After that little hoax we did, we went back into the front [door].

ECF No. 464, at 149-50; *see also* ECF No. 466, at 69 (Hendrix's testimony that, "after the first time we went in and we found the evidence, we actually left out of the house. And Sergeant Jenkins told Taylor to go to the back rear of the house and once – we go speak to a neighbor to act as if he actually got into a foot chase from someone leaving the house.").

> Although Mr. Taylor's trial counsel briefly cross-examined Ward about his pretrial statement, counsel did not make it clear to the jury that in that statement to the prosecutors and agent Ward *unequivocally stated that the actual events had occurred* (including based on what Sgt. Moore had said) and did not refer to it as a "ruse" or "hoax."  ECF No. 465, at 88-90.  Nor did trial counsel cross-examine Hendrix about his flatly inconsistent statement or his statement that Jenkins first

came up with the supposed "ruse" idea only *after* the detectives initially had searched Stevenson's house without a warrant.  In his pretrial statement, Hendrix stated that: "They *then* went into the house to clear it and make sure no one else was there" *after* they had chased the male and failed to catch him.

The government fails to appreciate how significant this line of impeachment would have been if Mr. Taylor's trial counsel had effectively cross-examined Ward and Hendrix about their pretrial statements.  It would have not only significantly impaired their credibility but also supported the defense that Mr. Taylor was an unwitting participant in the other officers' theft of the money from Stevenson's house (insofar as it would have offered an innocent explanation for Mr. Taylor's involvement with the other officers at Stevenson's house).  Mr. Taylor's chasing the young male as he ran away from the house was consistent with a belief that Stevenson had sent someone to remove the contraband from the house before the officers arrived.

The government also seeks to explain another pretrial statement by Ward – that the officers supposedly went to "Ward's basement," rather than Taylor's basement, to divide up the $200,000 taken from Stevenson's house – as a "clerical error" in the interview report.  Government's Response, at 40.  Again, the government improperly devalues important impeachment evidence.  It is highly unlikely that trained FBI agents make "clerical errors" in their FBI-302 reports.  And

in this case, that interview report was prepared by *two* law enforcement officers –
FBI Task Force Officer John Sieracki and FBI Special Agent Erika Jensen.
**Amended § 2255 Motion, Exhibit C** (5/10/2017 statement, at page 7).  The latter
was the case agent in this case.  It is inconceivable that both Officer Sieracki and
Agent Jensen would permit a "clerical error" to occur about such an important
alleged event.  Ward's prior statement about going to his basement is further
evidence of his (and Hendrix's) pattern of contradictions and lies at trial and the
evolution of their version of events by the time of trial.

### E. Trial Counsel Performed Deficiently by Failing to Offer Evidence that Mr. Taylor's House Did Not Have a Basement (Which Would Have Contradicted Ward's Testimony).

The government refers to this alleged act of deficient performance as
"irrelevant semantics."  Government's Response, at 40-41.  Referring to the bottom
level of a home as a "lower level or basement" is not merely a matter of "semantics."
A "basement" necessarily means at least part of that story of a home is underground.
A first level of a home that is not at least partly underground is not a "basement."
This is yet more impeachment evidence that Mr. Taylor's trial counsel could have
used to undermine Ward's credibility – particularly when considered with Ward's
prior statement that he and the other detectives went to "Ward's basement" (as
opposed to Taylor's basement) after the $200,000 was taken from Stevenson's
home.

**F. Trial Counsel Performed Deficiently by Failing to Offer Evidence that Rayam Lied Under Oath about What He Had Said in a Recorded Conversation About the Robbery of Sergio Summerville (Which Would Have Destroyed Rayam's Credibility).**

Without offering any evidence disputing the defense expert who has opined that former detective Gondo did not say what former detective Rayam claimed in his trial testimony (when referring to the secret recording), the government asserts that Mr. Taylor's trial counsel were not deficient for failing to call such an expert at trial to impeach Rayam. The government faults the expert for not identifying what Gondo actually said to Rayam on the recording. Government's Response, at 41. That entirely misses the point. The fact is that the expert's scientific analysis of the recording shows that Gondo did not say that he gave Mr. Taylor any money after encountering Sergio Summerville at his storage unit. What Gondo actually said on the recording is irrelevant, so long as the expert established that Gondo clearly did not say what Rayam claimed under oath at trial (including Gondo not saying "Taylor"). Trial counsel's cross-examination of Rayam and her argument to the jury – that the recording was "unintelligible" – was significantly different from presenting actual evidence that Gondo did not say what Rayam had claimed under oath at trial. If trial counsel had presented such expert testimony, the jury would have concluded that Rayam lied about what Gondo supposedly said. Such evidence also would have afforded Mr. Taylor's trial counsel the ability to challenge the

integrity of the government's investigation based on the false transcript of the purported statement by Gondo offered into evidence by the prosecution.[10]  This was clearly deficient performance by trial counsel.

### G. Trial Counsel Performed Deficiently by Failing to Impeach Shawn Whiting with His Grand Jury Testimony that a "Hispanic" Police Officer Took Custody of Whiting's Money in His Home.

The government contends that Shawn Whiting's grand jury testimony identifying a "Hispanic" officer as having taken the money from his bedroom is "irrelevant" because the trial testimony of Ward and Whiting supposedly proves that Mr. Taylor participated in the theft of the money after its seizure.  Government's Response, at 42.  The government seeks to minimize how Mr. Taylor's trial counsel could have used Whiting's grand jury testimony to impeach his trial testimony – and Ward's testimony about Mr. Taylor's alleged participation in the robbery of Whiting

---

[10] If they had offered proof that Gondo did not say what Rayan claimed, Mr. Taylor's trial counsel could have cross-examined Rayam about precisely what he told the prosecutors and agents before trial (in terms of what Gondo actually said) and also could have cross-examined the agents (including the case agent) about how the transcript of the supposed conversation between Rayam and Gondo was prepared.  Did the agents prepare the transcript based on their own listening to the tape or based on what Rayam told them?  Did they use an audio expert (such as Ms. Owens) to help them under what actually was said?  Did they prepare the transcript before they questioned Rayam about what Gondo supposedly said or prepare the transcript after Rayam told them what Gondo supposedly said?  Depending how the agents answered the questions, this line of questioning could have exposed the government to a closing argument by Mr. Taylor's trial counsel challenging the integrity of the government.  *Cf. United States v. Paylor*, 88 F.4th 553, 562 (4th Cir. 2023) ("This case presents the extraordinary circumstance in which the Government has taken antithetical stances supporting two completely different versions of the truth relative to Appellant's offense of conviction.").  One of the trial prosecutors in *Paylor*, AUSA Hines, also was one of the trial prosecutors in Mr. Taylor's case.  *United States v. Paylor*, No. 1:14-cr-00271-ELH (D. Md.) (ECF No. 85).

– that claimed that Mr. Taylor had possession of the money in Whiting's house.  The fact that, closer in time to the offense, Whiting did not identify Mr. Taylor as one of the officers who seized the money but, by the time of trial, Whiting was pointing the finger at Mr. Taylor is highly significant.  Just like Hendrix, Rayam, and Ward, Whiting's version of the truth evolved by the time of Mr. Taylor's trial.  Therefore, trial counsel were deficient in failing to impeach Whiting (and Ward) with Whiting's grand jury testimony.

### H. Trial Counsel Performed Deficiently by Failing to Offer Evidence that Whiting's Complaint Against the Officers (including Mr. Taylor) Filed with the Internal Affairs Division Was Found to Be Unsubstantiated.

The government claims that the IAD report would have been inadmissible and irrelevant at trial.  Government's Response, at 42.  The government errs.  Based on Whiting's own testimony that he filed a complaint with the IAD – *elicited from the prosecutor on Whiting's direct examination* – the IAD's findings would have been relevant and admissible.  The prosecution "opened the door" to it.  Trial counsel thus performed deficiently by failing to cross-examine Whiting about the IAD's finding that his complaint was unsubstantiated and seeking to offer a copy of the finding into evidence if Whiting had testified that he did not know the result of the IAD's investigation.

> **I. Trial Counsel Performed Deficiently by Failing to Impeach Keona Holloway with a Recorded Jail Call Between Her and Oreese Stevenson in Which She Acknowledged Attempting to Remove Contraband from Stevenson's Home Before Police Officers Arrived There.**

The government argues that the jail call recording was "consistent with her trial testimony." Government's Response, at 43. Remarkably, the government claims that "[t]he Court can see from the cited language that neither Holloway nor Stevenson reference[d] drugs, guns, or drug money." *Id.* The transcript speaks for itself. A rational jury certainly could conclude that Holloway and Stevenson were talking about her unsuccessful attempt to get to Stevenson's house before the officers did – for the obvious purpose of removing contraband and/or drug money.

The government fails to address how this jail call would have provided a basis for trial counsel to have argued that Holloway had sent her son to the house seeking to have him remove the drugs and drug money before the officers arrived. As explained in Mr. Taylor's amended § 2255 motion (at pages 81-82), the trial testimony of both Holloway and Donald Stepp, when considered together with Holloway's jail call, would have provided even more ammunition to challenge the testimony of Ward and Hendrix about a supposed "ruse" created by Jenkins and Mr. Taylor to justify a warrantless entry into Stevenson's house. The evidence appears to support a defense by Mr. Taylor that, rather than participating in a ruse, he engaged in legitimate police work at Stevenson's house (and was not aware of any

illegal theft of Stevenson's money by the other detectives).  Trial counsel thus performed deficiently by failing to offer the recording of the jail call between Stevenson and Holloway.

> ### J.  Trial Counsel Performed Deficiently by Failing to Offer Evidence that Mr. Taylor Received a Substantial Amount of Money in Workers' Compensation Benefits and From Other Legitimate Sources During the Relevant Time Period (Which Would Have Explained How He Could Afford to Purchase a New Deck for His Home).

The government argues that the evidence of Mr. Taylor's receipt of substantial amounts of money (more than $20,000) during the second half of 2016 (a gift from his parents and a workers' compensation payment) – in addition to his regular paycheck – fails to prove that such money could have been used to purchase the deck installed on his townhouse.  Government's Response, at 44.  Although not as compelling as the other evidence that his trial counsel failed to offer at trial, this evidence would have helped counter the prosecution's allegation that Mr. Taylor used $20,000 supposedly taken from Stevenson's home in March 2016 to purchase the deck.   Trial counsel thus was deficient for failing to offer such evidence.

> ### K.  Trial Counsel Performed Deficiently by Failing to Offer Evidence Raising a Reasonable Doubt About Whether Mr. Taylor Engaged in Time-and-Attendance Fraud.

The government claims that trial counsel did not perform deficiently by failing to offer evidence of the actual Baltimore Police Department time-and-attendance

(T&A) records. Government's Response, at 44-45.  Those records contradict the prosecution's assertion at trial that Mr. Taylor was off the clock on all of the days for which, the prosecution alleged, he was paid for work that he allegedly did not do.  The records also show that he worked for portions of July 14, 2016, and June 29, 2016, two of the days at issue.  *See* ECF No. 486, at 95-96.  That evidence, when combined with evidence of the lax enforcement of BPD's vague time-and-attendance and overtime policies during the relevant time period covered by the superseding indictment (2015-2017),[11] could have raised a reasonable doubt about whether Mr. Taylor specifically intended to defraud the police department or State of Maryland.  Trial counsel performed deficiently by failing to offer such evidence and argue to the jury there was insufficient of Mr. Taylor's specific intent to defraud, an essential element of wire fraud.

> **L.  Mr. Taylor's Trial Counsel Provided Ineffective Assistance by Failing to Object to the Prosecutor's Argument that Mr. Taylor Was Guilty of Racketeering Act Eight and Count Three Based on an Alleged Robbery of Keona Holloway and also by Failing to Ask for Jury Instructions Limiting the Jury's Consideration to Oreese Stevenson as the Victim.**

---

[11] As Hendrix stated to the prosecutors and agents in a pretrial interview:

> JENKINS said he had met with the Commissioner and that the Commissioner had asked JENKINS how he was keeping his squad motivated.  According to JENKINS, JENKINS had told the Commissioner that he gave them overtime and slash days and that the Commissioner said good job and to keep up the work.

**Exhibit D** (Hendrix's 5/5/2017, at page 12).

Finally, the government contends that trial counsel did not perform deficiently by failing to object to the prosecutors' argument that Keona Holloway was a victim of the alleged robbery charged in Racketeering Act Eight and Count Three and by failing to ask for a jury instruction that jurors could convict Mr. Taylor of Racketeering Act Eight and Count Three only if they found beyond a reasonable that *Stevenson* was the sole victim of the robbery/conspiracy (as the superseding indictment charged).  Government's Response, at 45-46.

The government is wrong for the same reason it is wrong in contending that there is sufficient evidence that Mr. Taylor is guilty of Racketeering Act Eight and Count Three based on Brown's money in the vehicle and/or Holloway's presence outside Stevenson's house when the officers took the $200,000.  Trial counsel were deficient for failing to object to the prosecutor's legally erroneous argument and to ask for jury instructions that required a finding that *Stevenson* was the sole victim of the charged robbery (for purposes of Racketeering Act Eight and Count Three).

### M. The Acts and Omissions Constituting Deficient Performance, When Considered Cumulatively, Prejudiced Mr. Taylor.

Without the testimony of Hendrix, Rayam, Ward, and Whiting, the jury would not have found the robbery/conspiracy racketeering acts essential to the jury's verdict for Counts One and Two and also could not have convicted Mr. Taylor of the Hobbs Act charge in Count Three.  The impeachment evidence discussed above,

if used effectively at trial, would have undermined the four witnesses' credibility and also called into doubt the integrity of the entire prosecution.  Of particular significance, the evidence would have shown the evolution of the witnesses' versions of events by the time of trial.  In addition, the defense evidence that Mr. Taylor's trial counsel failed to offer – including the recorded jail call and the time-and-attendance records – would have further challenged the prosecution's case. There is at least a "reasonable probability" that, without such instances of deficient performance (when considered cumulatively), the result of the trial would have been different.  *Strickland*, 466 U.S. at 694-95.

## **CONCLUSION**

This Court should grant Mr. Taylor relief under 28 U.S.C. § 2255 by entering a judgment of acquittal regarding Counts One, Two, and Three.  Alternatively, this Court should (1) vacate Mr. Taylor's convictions of the charges in those three counts and order a new trial or (2) order a new direct appeal.  At the very least, this Court should conduct an evidentiary hearing and issue subpoenas and writs of habeas corpus *ad testificandum* for necessary witnesses (including Hendrix, Rayam, and Ward, as well as Mr. Taylor's prior counsel at trial and on direct appeal).  As noted in his amended § 2255 motion, Mr. Taylor has not raised a due-process claim of

knowing subornation of perjury by the government at trial[12] in his amended § 2255 motion.  However, if such evidence is developed at an evidentiary hearing – through the testimony of Hendrix, Rayam, or Ward (each of whom appear to have lied under oath at trial) – Mr. Taylor reserves the right to amend his § 2255 motion a second time in order to include such a due-process claim.  **For that reason, Mr. Taylor requests that this Court conduct an evidentiary hearing at least a week before October 10, 2024**[13] – the date when the one-year limitations period expires.  By separate motion, Mr. Taylor moves this Court to extend the date for filing a second amended § 2255 motion until 7 days following the conclusion of an evidentiary hearing (if it occurs after October 3, 2024).

---

[12] *See Napue v. Illinois*, 360 U.S. 264 (1959); *Boyd v. French*, 147 F.3d 319, 329 (4th Cir.1998); *cf. United States v. Paylor*, 88 F.4th 553, 562 (4th Cir. 2023) ("This case presents the extraordinary circumstance in which the Government has taken antithetical stances supporting two completely different versions of the truth relative to Appellant's offense of conviction.").

[13] Undersigned counsel estimates that such a hearing would take no more than two days of testimony.  Mr. Taylor would call as witnesses his prior trial and appellate counsel; former detectives Hendrix, Rayam, and Ward; Mr. Taylor's current investigator, Mike McGee; and FBI Agent Erika Jensen (the case agent).  Mr. Taylor also would offer evidence of Baltimore City Police Department time-and-attendance records.  If counsel for the government disputes the accuracy of the expert report of Jennifer Owen – concerning the audio-recording of Rayam's conversation with Gondo – Mr. Taylor also would call Ms. Owens to testify at the hearing.

Respectfully submitted,

/s/ *Brent E. Newton*

Brent E. Newton
Maryland Attorney # 2002060016
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
brentevannewton@gmail.com

**Appointed Counsel for**
**Marcus Taylor**

## CERTIFICATE OF SERVICE

On September 12, 2024, I electronically filed this document with the Clerk of

Court using the CM/ECF system, which will send notification to all counsel of

record.

/s/ *Brent E. Newton*

Brent E. Newton