**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| **v.** | * | **Case No. 1:17-cr-00106-006** |
| **MARCUS TAYLOR,** | * | |
| **Defendant.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**THE UNITED STATES OF AMERICA'S OPPOSITION TO DEFENDANT MARCUS
TAYLOR'S MOTION FOR LEAVE TO AMEND HIS FIRST AMENDED MOTION FOR
POST-CONVICTION RELIEF**

The United States, by its undersigned counsel, submits this Opposition to Defendant Marcus Taylor's Motion for Leave to Amend his § 2255 Motion.

As with Taylor's previous arguments, his argument is both procedurally inappropriate and factually inaccurate. Procedurally, Taylor cannot raise a due process claim in a successive § 2255 motion filed after an appeal, and so the Court should deny the Motion for Leave as moot. Factually, Taylor continues to pursue his theory that the ruse to get into Oreese Stevenson's house was made up, not by Wayne Jenkins, but by the prosecution team. Taylor strings together cherry-picked facts to support his narrative at the expense of the entire trial record. Keona Holloway's son was outside of Oreese Stevenson's house that evening, and Jenkins made up a story about a person fleeing from inside the house out the back of the house to create probable cause to enter the house. Both of these facts were presented to the jury, and these facts are not contradictory. The Court should deny the Motion.

## I.     TAYLOR IS NOT ENTITLED TO ANOTHER SUCCESSIVE HABEAS FILING

Defendant Marcus Taylor should not be allowed to have another bite at the apple in his attempt to relitigate his trial.  Taylor has had numerous opportunities to appeal his convictions for Racketeering Influenced Corrupt Organization ("RICO") Conspiracy, substantive RICO charges, and Hobbs Act Robbery, and he did so in numerous ways.

To briefly summarize the voluminous nature of the litigation since Taylor's February 13, 2018 convictions at trial, on May 7 and May 13, 2018, Taylor filed motions for a new trial, which Judge Blake denied.  ECF Nos. 371, 376, 389.  Then, on June 14, 2018, Taylor filed his notice of appeal, and raised his disagreements with a number of the trial court's rulings to the Fourth Circuit. ECF No. 426.  However, the appellate court affirmed those rulings and his convictions.  *United States v. Taylor*, 942 F.3d 205, 217 (4th Cir. 2019).  The Supreme Court then denied his petition for a writ of certiorari on October 10, 2023 (after Taylor's subsequent appeal involving the district court's restitution order).  *Taylor v. United States*, 144 S. Ct. 297 (2023).

Taylor then filed a series of *pro se* 28 USC § 2255 motions seeking to vacate his convictions, and the Court appointed counsel for Taylor so that he could file a single, consolidated motion.  *See* ECF Nos. 592, 658, 716, 731, 737, 784, 822.  Taylor's counsel filed an amended Section 2255 motion seeking to vacate his conviction on June 14, 2024.  ECF No. 846.  After the government filed a detailed response on September 6, 2024, ECF No. 872, Taylor's counsel filed a reply on September 12, 2024, ECF No. 876.  On the same day, Taylor's counsel filed a motion to extend the 28 U.S.C. § 2255(f) statute of limitations until seven days after an evidentiary hearing (that the Court had not ordered) based on a related-but-distinct due process claim alleging that multiple trial witnesses had committed perjury during the trial.  ECF No. 877.

Then, on September 24, 2024, Taylor's counsel filed the instant Motion to amend his Section 2255 motion to include the previously-mentioned due process claim since "[u]ndersigned counsel no longer believes that Mr. Taylor needs to await an evidentiary hearing in order to have a factual basis to raise" it.  ECF No. 882.  Taylor's counsel now argues that the statement of facts attached to Wayne Jenkins's plea agreement – which he previously triaged as unimportant – provides a factual basis for this due process claim.  *Id.*

As discussed in response to Taylor's first amended § 2255 petition, the doctrine of procedural default generally prevents a district court from reaching the merits of § 2255 claims that were not raised on direct appeal unless a petitioner can show: (1) cause excusing the failure to directly appeal such alleged errors; (2) actual prejudice resulting from the errors of which he complains; or (3) "in limited circumstances, a miscarriage of justice would result from the refusal of the court to entertain the collateral attack," such as where a petitioner can demonstrate actual innocence.  *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999).

Taylor can show none of these things.  One of the few legal exceptions excusing such a procedural default is a valid claim of actual innocence.  But this requires Taylor "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Given that Taylor's trial and appellate counsel had access to the same factual stipulations attached to Jenkins's and others' plea agreements – and Taylor's new due process claim was not raised at trial or on direct appeal – Taylor cannot argue that there is "new evidence" that could justify this new claim.  *See Maycock v. United States*, 2024 WL 1283306, at *4 (D. Md. Mar. 25, 2024) (discussing the examples of the type of new evidence that have been found to satisfy the actual innocence gateway standard).

Taylor cannot now bring this "due process perjury claim" for the first time on a (successive) Section 2255 motion.  Accordingly, the Court should deny his Motion for Leave.

## II.    EVEN WERE THE COURT TO CONSIDER TAYLOR'S NEW DUE PROCESS ARGUMENT, THE CLAIM OF PERJURED TESTIMONY IS BASELESS

Taylor cannot demonstrate any evidence that the prosecution elicited false or perjured testimony by witnesses Evodio Hendrix ("Hendrix") and Maurice Ward ("Ward"), much less material false or perjured testimony.  Instead, Taylor conflates two separate, non-conflicting events on the night that Taylor and his co-conspirators broke into Oreese Stevenson's ("Stevenson") house.  First, Keona Holloway's ("Holloway") son was outside of the house at some point that day; and second, Jenkins told Taylor to act out his ruse idea to create a pretext to enter the house without a warrant.  Both are true, both are supported by the trial evidence, and neither conflict with the other.

### A.  Legal Standard

In prosecuting a criminal trial, the Due Process Clause obliges the government not to knowingly use false evidence, including false testimony, to obtain a tainted conviction.  Accordingly, a conviction acquired through the knowing use of perjured testimony by the prosecution violates due process.  On collateral attack, a movant alleging this sort of misconduct must demonstrate three elements: (1) that the testimony at issue was false; (2) that the prosecution knew or should have known of the falsity; and (3) that a reasonable probability exists that the false testimony may have affected the verdict.  Testimony by a law enforcement officer that is knowingly false or misleading is imputed to the prosecution.

*Byers v. United States*, 2022 WL 17850122, at *8 (D. Md. Dec. 22, 2022) (Bennett, J.) (cleaned up).  District of Maryland Courts and the Fourth Circuit "have consistently found alleged perjury harmless when substantial corroborating evidence gave the jury ample grounds to convict."  *Id.*

### B.  The Jury Knew that Keonna Holloway's Son was at Stevenson's House.

Taylor's claims of alleged perjury focus on one sentence of the Jenkins plea stating that Keona Holloway's son was "at" Stevenson's house. Although he does not say so explicitly, Taylor's argument implies that that the prosecution chose not to elicit this fact at trial because it was inconsistent with the "ruse." To the contrary, the prosecution elicited testimony from multiple witnesses about Holloway's son being at Stevenson's house. The prosecution elicited testimony from Holloway that she learned of the search at Stevenson's house because her son was there and called her, and she further testified on cross-examination that her son was "outside" the house. ECF No. 468, Vol. V at 70, 90-91. The prosecutors elicited testimony from Donald Stepp ("Stepp"), who testified that, before the officers arrived at the house, a "younger gentleman" was "on the back" of the house, which he clarified on cross-examination meant the back porch, but that this person ran away as Stepp drove through a back alley. ECF No. 469, Vol. VI at 50, 121, 123. Hendrix testified that there was a boy in the street, that he assumed was Holloway's son, but that "He was never at the house. The way they -- we made it seem like he was at the house." ECF No. 466, Vol. III at 116. Taylor thinks that the presence of Keonna Holloway's son at Stevenson's house proves that Hendrix and Ward lied about the ruse. The prosecutors presented both of these events to the jury, and the jury did not find them to be in conflict.

### C. Taylor is Incorrect that the Jenkins's Plea Agreement Contradicts Hendrix's and Ward's Trial Testimony

Taylor has failed to articulate any conflict between Jenkins's plea agreement (or the trial evidence about Holloway's son generally) and Hendrix's and Ward's trial testimony. Taylor mistakenly claims (at 12) that a sentence in Jenkins's plea agreement – stating that Holloway's "son was at [Stevenson's] residence when JENKINS, Taylor, Hendrix and Ward arrived . . ." – is "contrary to the testimony of Hendrix and Ward." He makes two faulty claims in support. First, Taylor argues that the detectives testified at trial that "no young male was present on Stevenson's

property when the four detectives arrived." This is inaccurate, and moreover, Hendrix testified to the opposite. Second, Taylor claims (at 12-13) that the sentence in Jenkins's plea agreement (about Holloway's son being **at** the residence) contradicts "the detectives' statement to the next-door neighbor that Mr. Taylor had chased a young man from the house was a 'ruse.'" There is no such contradiction.

*One*. Hendrix and Ward did not state that *no young male was present in the area* when the detectives arrived. To the contrary, both witnesses merely testified that the pretextual cover story (about a young male running from inside the house out of the back door of the house) was fictitious. The evidence indicates that Holloway's son was outside of the house on the back porch at some point, but there was no evidence that he ran from inside the house out of the back of the house. As the trial transcript shows, Taylor's trial defense counsel asked Ward about what he saw when he arrived at the house: "So there was nobody, then, in the **backyard**?" ECF No. 354, at 90 (emphasis added). Ward answered, "No, sir." *Id.* Similarly, trial defense counsel had the following exchange with Hendrix about the detectives' arrival:

Q. So from what you learned on the scene that day, there was never anybody running from **behind** the house; correct?

A. Correct

Q. There was no one **in** the house when you all got there, the 1604 address; correct?

A. Correct. . . .

Q. Okay. To your knowledge, even sitting here today, there had not been a young boy **behind** that house; correct?

A. Correct.

ECF No. 355, at 88, 91-92 (emphasis added).  As shown in the bolded text above, defense counsel's questioning of the witnesses primarily focused on whether there was someone **in** and/or **running from the back** of the house when the detectives arrived.  In comparison, Jenkins's factual stipulation merely stated that Holloway's "son was **at** their residence when JENKINS, Taylor, Hendrix and Ward arrived . . ."  ECF No. 882-2 (*United States v. Jenkins*, No. 1:17-cr-00638-GLR, ECF No. 5, ¶ 29) (emphasis added).  While the word "at" in the factual stipulation is imprecise as to precisely where Holloway's son was physically located when the detectives arrived, Hendrix separately discussed the location of Holloway's son during defense counsel's cross-examination.  Specifically, Hendrix testified: "It was a situation where we -- when we pulled up, **we seen a boy on the street**, **not over there by the house**, and we just put two and two together and asked her [Holloway]."  ECF No. 355, at 89 (emphasis added).  This would seem to indicate that Holloway's son was **in front** of the house when the detectives arrived, not running from the back door as Taylor argues here.[1]  Further, Stepp testified that he saw a younger gentleman on the back porch of the house, but that he ran away before any of the GTTF officers arrived.  ECF No. 469, Vol. VI at 121-24.  By the time the GTTF officers arrived, Stepp was parked two blocks away looking at the house with his binoculars.  ECF No. 469, Vol. VI at 49, 119.  The trial record showed that Holloway's son fled from the back porch of the house before officers arrived, and, perhaps, had been in the street in front of the house when they arrived.

---

[1] Moreover, while Hendrix stated that Holloway speculated that her son "**could** have ran" because he was scared of the police, this was her response to one of the detectives falsely telling her that her son had run from the house.  ECF No. 355, at 89, 91 (emphasis added).  This is a far cry from validating the detectives' pretextual ruse that they witnessed an individual running from the back door of the house.  Donald Stepp, the neighbor, likewise merely testified that he saw a teenager on the back porch of the house before the detectives arrived.  ECF No. 469, Vol. VI at 121.  This is consistent with both Ward's and Hendrix's trial testimony.

Taylor has pointed to no evidence in support of his argument that the detectives lied about the ruse – that is, Taylor has presented no evidence that anyone actually witnessed Holloway's son **in** the house at any point, much less witnessed him running out the back door of the house upon the detectives' arrival.   Instead, Taylor points to evidence that the jury was already shown: Holloway's son was on the back porch at some point before the detectives arrived, and the detectives never witnessed someone exiting the house in line with their fictitious cover story to justify entering the house without a warrant.

*Two*.   Taylor provides no support or justification for his insistence (at 12-13) that Jenkins's plea agreement (which stated that Holloway's "son was at [Stevenson's] residence when JENKINS, Taylor, Hendrix and Ward arrived . . .") indicates that Taylor **chased** Holloway's son. Nowhere does this suggestion appear in Jenkins's plea agreement.   As mentioned, the jury heard evidence at trial that Holloway's son was near the house at the time in question.  *See, e.g.*, ECF No. 469, Vol. VI at 121 (When Stepp was asked whether he saw a "a young man in the back of the house" before the detectives arrived, he testified: "Correct; Correct on the porch."); ECF No. 355, at 89 (Hendrix testified: "when we pulled up, we seen a boy on the street, not over there by the house . . .").   However, this does nothing to support Taylor's current claim that he "chased" Holloway's son, and there is no contradiction between Jenkins's plea agreement and the relevant trial testimony.  Rather, both indicate that Holloway's son was not in the house during the relevant time period.

### D.  Taylor is Incorrect that the Line in Leo Wise's Book Contradicts Hendrix's and Ward's Trial Testimony

Taylor also makes a claim in passing (at 13 & n.4) that AUSA Wise's book about his work on Gun Trace Task Force cases contradicts Ward's and Hendrix's trial testimony.  But once again, Taylor articulates no contradiction.  In full, the passage Taylor cites to says as follows:

On March 22, around 5:30 p.m., Holloway's older son called her at work. He had been waiting for her on the porch at their home, but now someone else was at the house. She left work immediately and headed to Heathfield. On the way, she called her mother-in-law and asked her to go there, too. When she arrived thirty minutes later, two police officers were sitting in her living room.

ECF No. 882-5 (Leo Wise, *Who Speaks for You?: The Inside Story of the Prosecutor Who Took Down Baltimore's Most Crooked Cops* 81 (2023)). For the same reasons as discussed *supra* II.B-C, the account in the book is consistent with the trial testimony. Taylor has pointed to no evidence that places Holloway's son in the house at any point during the relevant period. This is fatal to his argument that there was hidden evidence which contradicted Ward's and Hendrix's trial testimony about the detectives' ruse to justify entering Stevenson's house without a warrant.

### III.    CONCLUSION

For these reasons, the Defendant's Motion to amend his 28 U.S.C. § 2255 motion should be denied, but in any event, Defendant's due process perjury claim should be rejected out of hand.

Respectfully submitted,
Erek L. Barron
United States Attorney

By:    _____/s/_____

Matthew P. Phelps
Jared M. Beim
Adeyemi O. Adenrele
Assistant United States Attorneys
36 S. Charles Street
Suite 400
Baltimore, MD 21201