## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **Criminal Case: SAG-17-0106** |
| | * | |
| | * | **Civil Case:     SAG-24-2015** |
| **MARCUS TAYLOR** | * | |
| | * | |

*       *       *       *       *       *       *       *       *       *       *       *

## <u>MEMORANDUM</u>

Marcus Taylor, a former officer with the Baltimore Police Department ("BPD") and its Gun Trace Task Force ("GTTF"), has filed an amended motion to vacate his conviction and sentence under 28 U.S.C. § 2255.[1] ECF 846. The Government has filed a response, ECF 872, and Mr. Taylor filed a reply, ECF 876. Mr. Taylor has also sought leave to amend his motion. ECF 882. The Government opposed, ECF 884, and Mr. Taylor filed a reply, ECF 885. For the reasons explained below, Mr. Taylor's motion for leave to amend will be granted, and Mr. Taylor's § 2255 motion, as amended, will be denied.

Mr. Taylor has requested an evidentiary hearing in connection with this motion. However, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. Despite Mr. Taylor's request for an evidentiary hearing, this Court finds that his motion presents exclusively legal

---

[1] Initially, Mr. Taylor filed a number of *pro se* motions and other filings seeking relief pursuant to § 2255, along with myriad motions seeking appointment of counsel. *See, e.g.*, ECF 592, 593, 603, 609, 644, 646, 649, 650, 651, 658, 691, 758. Eventually, this Court did appoint counsel to represent Mr. Taylor and set a schedule for amended briefing of the § 2255 issues, to streamline the case for disposition. ECF 816; ECF 821.

issues, not disputes of fact. *See United States v. Witherspoon*, 231 F.3d 923, 926–27 (4th Cir. 2000); 28 U.S.C. § 2255(b). It appears that Mr. Taylor envisioned the evidentiary hearing as an opportunity to "do over" portions of the trial by exploring lines of examination his counsel forewent. That is not the purpose of an evidentiary hearing in a § 2255 context. No evidentiary hearing is necessary, and this Court finds that the issues presented can be decided on the parties' extensive briefing without further argument. *See* Loc. R. 105.6 (D. Md. 2023).

## I.      PROCEDURAL BACKGROUND

Because this Court finds that an evidentiary hearing is unnecessary to resolve this motion, the Court will consider the facts in the light most favorable to Mr. Taylor as the § 2255 movant. *See United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). There are few factual disputes because of the robust trial record, from which all of Mr. Taylor's claims stem.

The Government originally indicted and charged Mr. Taylor, along with six other members of the GTTF, with racketeering and participation in a racketeering conspiracy. ECF 1. Four of the seven defendants, Momodu Gondo, Evodio Hendrix, Jemell Rayam, and Maurice Ward, pleaded guilty to the racketeering conspiracy and agreed to cooperate with the Government. ECF 156, 157, 195, 215. In July of 2017, a federal grand jury returned a superseding indictment charging the remaining three defendants, Mr. Taylor, Daniel Hersl, and Wayne Jenkins, with racketeering conspiracy in violation of 18 U.S.C. § 1962(d); racketeering in violation of 18 U.S.C. § 1962(c); Hobbs Act Robbery in violation of 18 U.S.C. § 1951; and possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). ECF 137.

Mr. Jenkins ultimately entered a guilty plea, ECF 257, but Mr. Taylor and Mr. Hersl proceeded to trial. At trial, the jury heard testimony from Mr. Ward, Mr. Hendrix, Mr. Rayam, and Mr. Gondo about the unlawful actions they engaged in with Mr. Taylor, Mr. Hersl, and Mr.

Jenkins. The jury also heard testimony from a number of law enforcement officers, victims, and witnesses, to include Shawn Whiting, Oreese Stevenson, and Keonna Holloway. The trial lasted twelve days. Eventually, on February 12, 2018, the jury returned verdicts of guilty against both defendants as to the crimes charged in Counts One, Two, Three, and Five, and verdicts of not guilty as to the firearms charges in Counts Four and Six.[2] ECF 342.

Counsel for Mr. Taylor filed a motion for new trial, which was denied. ECF 371, 396, 399, 405. At Mr. Taylor's sentencing, United States District Judge Catherine C. Blake imposed sentences of 216 months as to each of the three counts of conviction, to run concurrent for a total sentence of 216 months. ECF 416. Counsel for Mr. Taylor also filed an appeal, but the Fourth Circuit affirmed his convictions and sentence. ECF 531.

Mr. Taylor's new court-appointed counsel has now filed this amended § 2255 motion, in which he argues insufficiency of the evidence and a number of arguments about ineffective assistance of counsel at the trial and appellate levels. ECF 846. His motion was timely, having been filed less than a year after the Supreme Court denied certiorari on his appeal of the amended judgment in this case. 18 U.S.C. § 2255(f)(1); *Taylor v. United States*, 144 S.Ct. 297 (Oct. 10, 2023). He has also sought leave to amend his amended motion, ECF 882, to add a Constitutional claim. This Court will grant his motion for leave to amend and will consider that argument herein.[3]

Each argument will be addressed below.

## II.   ACTUAL INNOCENCE ARGUMENT

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate 'cause' and

---

[2] Counts Five and Six pertain only to Mr. Hersl, not Mr. Taylor.
[3] This Court finds that Mr. Taylor's previous motion to extend the statute of limitations deadline, ECF 877, which the Government opposed, ECF 881, is moot and thus will deny it as such.

'actual prejudice' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted). Mr. Taylor first challenges his convictions on Counts One, Two, and Three of the indictment, contending that he is actually innocent of all three charges of conviction. ECF 846 at 15. This Court agrees with the Government (at ECF 872 at 15) that Mr. Taylor's assertions, which amount to insufficient evidence arguments premised on legal contentions, are not properly raised as actual innocence claims on collateral review.

A "collateral challenge may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 164 (1982). Accordingly, the general rule is that "claims not raised on direct appeal may not be raised on collateral review," *Massaro v. United States*, 538 U.S. 500, 504 (2003), absent an argument that the Petitioner "is actually innocent." *Bousley*, 523 U.S. at 622. The movant bears the burden to "show actual innocence by clear and convincing evidence." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1990). An actual innocence claim cannot be raised in all circumstances. "To be credible, [an actual innocence claim] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Mr. Taylor offers no new evidence in support of his actual innocence claim. Instead, he simply argues a mismatch between his interpretation of the governing law and the evidence adduced at his trial—exactly the type of arguments appropriate to raise on direct appeal. His argument, then, is one of legal innocence, not factual innocence, making it inappropriate for consideration as an actual innocence claim. *Cf. Jones v. Hendrix*, 599 U.S. 465, 506 (2023) (Jackson, J., dissenting) (noting that legal innocence claims are subject to ordinary time limits). A successful actual innocence "petitioner must demonstrate actual factual innocence of the offense

of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *Mikalajunas*, 186 F.3d at 494.

Accordingly, this Court rejects Mr. Taylor's actual innocence arguments, insofar as he uses them in an attempt to revive insufficient evidence claims that he should have raised on direct appeal. This Court will nevertheless reach the merits of his insufficient evidence claims in considering whether his trial and appellate counsel had to raise them to be effective.

## III. INEFFECTIVE ASSISTANCE FOR FAILURE TO RAISE ARGUMENTS ON TRIAL AND APPEAL

### A. Mr. Taylor's Insufficient Evidence Claims

Mr. Taylor argues that the Government offered insufficient evidence to sustain his convictions on each of the three counts. This Court disagrees, for the reasons described below.

#### 1. Count One

In convicting Mr. Taylor of conspiracy to commit racketeering, the jury found that Mr. Taylor committed two specific acts: "Racketeering Act Eight"—an incident involving Oreese Stevenson, and "Racketeering Act Twenty"—one of several interstate wire fraud overtime claims. Mr. Taylor's current contention is that the Government did not prove two racketeering acts because his conduct vis-à-vis Oreese Stevenson (called "O.S." in the Superseding Indictment) did not constitute robbery under Maryland law.[4] The relevant portions of the Superseding Indictment read as follows:

---

[4] On direct appeal, Mr. Taylor's appellate counsel argued that his conviction for Count One should be overturned because there was insufficient evidence to support the wire fraud racketeering act. In disposing of that argument, the Fourth Circuit recognized that "if the evidence was insufficient to support a finding that the defendants' conduct constituted wire fraud under § 1343, as the defendants contend, one of the two necessary acts would be voided, requiring reversal of the defendants' convictions on Count One." *United States v. Taylor*, 942 F.3d 205, 213 (4th Cir. 2019).

**March 22, 2016, Robbery/Extortion of O.S.**

27. On or about March 22, 2016, Sergeant JENKINS and Detectives TAYLOR, E.H., and M.W., acting in their capacity as police officers, conducted a traffic stop and arrested O.S. The defendants seized suspected narcotics and $21,500 from O.S. JENKINS only submitted $15,000 of the $21,500 that was taken from O.S. and kept the rest for himself. At the time of the arrest, the defendants also took O.S.'s house key and looked at his driver's license which identified the location of O.S.'s residence.

28. To conceal his illegal conduct, on or about March 22, 2016, JENKINS approved an incident report, authored by E.H., which falsely stated that only $15,000 had been seized from O.S., when in fact, $21,500 had been seized from O.S. Above his signature, JENKINS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS did not submit the $6,500 he stole from O.S. to the BPD.

29. Following the arrest of O.S., Jenkins, Taylor, E.H., and M.W. entered O.S.'s residence. JENKINS, TAYLOR, E.H. and M.W. stole money, including approximately $200,000 from a safe they opened and from two bags they seized, and property, including a Breitling men's wristwatch valued at $4,000 from the location.

30. After JENKINS had emptied the safe he put $100,000 back into it and had the other members of the GTTF create a video, on TAYLOR's cellular telephone, that purported to show them opening the safe and finding the money.

31. After the search, JENKINS, TAYLOR, E.H. and M.W. went to TAYLOR's house. In TAYLOR's basement, JENKINS gave TAYLOR, E.H. and M.W., at least $20,000 each from the money that had been stolen from O.S. JENKINS kept the rest of the money for himself.

\* \* \* \*

**Racketeering Act Eight**
(March 22, 2016, Robbery / Extortion of O.S.)

28. On or about March 22, 2016, in the District of Maryland, Sergeant JENKINS and Detective TAYLOR, the defendants, acting in their capacity as police officers, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Eight:

      a. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together

---

Mr. Taylor now pursues that same result by seeking to void the other of the two racketeering acts that the jury found.

with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from O.S. with O.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from O.S. with O.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702

c. as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from O.S. with O.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702

d. unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L § 1-203 and § 3-402;

e. attempted to commit robbery in violation of MD. CODE ANN., Crim. L § 3-402, and

f. committed robbery in violation of MD. CODE ANN., Crim. L § 3-402.

The Fourth Circuit summarized the evidence relating to the incident as follows:

More particularly, the government presented evidence to show that GTTF officers, including Taylor, targeted a drug dealer, Oreese Stevenson, as he was in a minivan selling cocaine to Demetrius Brown. In searching the vehicle, the officers found cocaine and a backpack containing money. Stevenson testified at trial that, while he had not counted the money, he expected the bag to contain approximately $21,500 from Brown as payment for the cocaine. He explained that he knew Brown and that Brown had always brought the correct amount of money. But after Taylor seized the money from the vehicle, he brought only $15,000 to police headquarters, and that $15,000 was submitted to the evidence control unit of the Police Department. After this stop and seizure, the GTTF officers went to Stevenson's house and did what they

called a "sneak-and-peek," which involves, as one former officer testified, "go[ing] [into someone's home] without [anybody] knowing and sneak[ing] around the house and tak[ing] a peek and search[ing]throught the house without a search warrant." During the search, they uncovered cocaine and a safe, and some officers then left to obtain a search warrant. Upon returning with the warrant, officers pried open the safe and found $200,000. After taking $100,000 for themselves, they reported that only $100,000 had been found in the safe. The officers, including Taylor, then split the $100,000 among themselves.

942 F.3d at 211–12. Some additional factual clarifications from the trial testimony are pertinent. Mr. Stevenson testified that he and Mr. Brown had not yet made the exchange of drugs for money when the officer approached. ECF 468 at 32. And Ms. Holloway, Mr. Stevenson's partner, testified that after the officers, with guns and badges, came into her home, she was not free to move around and had to stay in the living room as they went through her residence and unlawfully arranged to take property. *Id.* at 74. When one of the officers told her to leave, Ms. Holloway believed that she would be arrested if she did not leave her home before the officers actually took the property using their unlawful warrant. *Id.* at 78. She did not feel she could return until the following day. *Id.* at 79.

Mr. Taylor contends that Racketeering Act Eight had to be predicated on a robbery of Mr. Stevenson, not anyone else, in light of the parenthetical under the heading (referring to "Robbery/Extortion of O.S.") and the language used in the count. In Mr. Taylor's view, neither the events at the vehicle nor the events at Mr. Stevenson's home constituted robbery of Mr. Stevenson: the vehicle because the money taken still belonged to Mr. Brown as the drug customer, not Mr. Stevenson, and the home because Mr. Stevenson was not present to be robbed. This Court disagrees that the Government's proof had to be so restricted.

First, the Superseding Indictment specifically enumerated six different ways that "Racketeering Act Eight" could be committed. The first three options relate to extortion of "O.S."

(Mr. Stevenson), either by substantive offense, conspiracy, or attempt.[5] The second three options describe robbery (again by substantive offense, conspiracy, or attempt) and do not reference or identify a particular victim. It is those enumerated provisions that define the charged offense, not the parenthetical underneath the heading of the section of the indictment. This Court does not believe that such a parenthetical constitutes any more than surplusage, and it does not define the scope of the charge. *See, e.g.*, *United States v. Pazsint*, 703 F.2d 420, 423 (9th Cir. 1983) ("[I]t is well established that the caption is completely surplusage and does not control the body of the indictment."); *United States v. Dawson*, 516 F.2d 796, 804 (9th Cir. 1975) (finding that indictment caption is "completely surplusage"); *United States v. Hitt*, 107 F. Supp. 2d 29, 32 n.3 (D.D.C. 2000) ("[T]he heading of a section of an indictment is largely surplusage and is irrelevant"). What matters is whether the Government proved one of the six options the grand jury specified would constitute Racketeering Act Eight, not whether the Government's evidence comported with a parenthetical under a section heading.

Second, this Court agrees with the Fourth Circuit that the evidence "was sufficient for the jury to infer that Mr. Taylor robbed Mr. Stevenson and his passenger, Demetrius Brown, when he took a portion of the cash seized from the van." 942 F.3d at 217. The focus of the Fourth Circuit's analysis on appeal was whether all of the items removed from the vehicle had been turned over to the BPD's evidence control unit. Mr. Taylor's present focus is different: he contends that because Mr. Stevenson did not have an ownership or other legal interest in the money taken from the vehicle, only his passenger, Mr. Brown, could have been robbed.

---

[5] In the context of Count Two, the jury specifically found that Mr. Taylor had committed robbery and conspiracy to commit robbery, not extortion, so the first three options are presently irrelevant. ECF 342 at 11.

This Court believes Mr. Taylor's reading of Maryland law is overly narrow. He cites *Harrison v. State*, 238 A.2d 153, 155 (Md. App. 1968), for the proposition that the offense of robbery in Maryland requires that the victim have "custody over the property" and "a legal interest or special property interest" in the property. *Harrison* considered the question of whether a cashier at a neighborhood store, who turns over store property in a robbery, is a robbery victim, and answered the question in the affirmative. Neither *Harrison* nor any other Maryland case this Court can find answers the question of whether, if a would-be robber approaches multiple victims but only obtains actual property from one, each person present is a victim of the robbery or whether the only person "robbed" is the one deprived of actual property. Also, in a situation like that presented here, Mr. Stevenson and Mr. Brown were in the vehicle with immediate intent to engage in a narcotics deal. Mr. Stevenson brought drugs and Mr. Brown brought money to effect the transaction. While the formal exchange had not yet occurred, there is an argument that both men had constructive possession of the transaction-related items in the vehicle at the time the officers approached. Finally, while the Fourth Circuit's analysis focused exclusively on the money taken from the vehicle, the officers also took drugs and Mr. Stevenson's house key. Both of those items were property taken by force from Mr. Stevenson (and the house key was then used for unlawful acts). The Fourth Circuit's holding, then, that both Mr. Stevenson and Mr. Brown were robbed, comports with the Government's evidence.

Additionally, the jury also could have reasonably concluded that Racketeering Act Eight had occurred based upon the robbery of Keonna Holloway at Mr. Stevenson's home. Nothing in the language of Racketeering Act Eight limited the robbery victim to Mr. Stevenson. As the Government argued in closing argument, the officers exercised force against Ms. Holloway by appearing with guns and badges in her home and requiring her to remain on the couch while they

took actions to secure for themselves the ability to remove cash and property. The fact that Ms. Holloway later exited the home before the property was actually removed is of no moment—the officers used force to get into the home and take property.

On any of these theories, the Government adduced sufficient evidence regarding Racketeering Act Eight for a reasonable jury to convict Mr. Taylor of Count One.

### 2. Count Two

Mr. Taylor contends that the Government introduced insufficient evidence to establish that he committed the two predicate acts of racketeering necessary to convict him of the racketeering offense in Count Two. With respect to this count, the jury determined that the Government had proved Mr. Taylor committed seven predicate acts: conspiracy to commit robbery with respect to the January 24, 2014 robbery involving Shawn Whiting, robbery and conspiracy to commit robbery with respect to the March 22, 2016 incident involving Oreese Stevenson, conspiracy to commit robbery with respect to the September 7, 2016 incident involving Sergio Summerville, and three acts of interstate wire fraud on July 20, 2016, August 3, 2016, and August 17, 2016. ECF 342.

Mr. Taylor's first argument is that the three wire fraud incidents should have constituted a single predicate, not three separate predicates. Citing a civil RICO case, *Al-Abood ex re. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000), he argues that multiple acts of wire fraud involving the same victims cannot constitute separate "racketeering acts." ECF 846 at 41. But *Al-Abood* does not stand for that proposition. In that case, the plaintiff alleged that her former family friends had carried out three different schemes to defraud her of money by convincing her to invest in real estate ventures, a charitable trust, and a brokerage account. The Fourth Circuit explained that "it is possible for defendants to be guilty of RICO violations if they commit two or more acts

of mail or wire fraud and the acts are sufficiently related and sufficiently continuous." 217 F.3d at 238. But it further warned that courts must be cautious "to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Id.* The Court noted, "We have reserved RICO liability for 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Id.* (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)). The Fourth Circuit concluded that the *Al-Abood* case was "not sufficiently outside the heartland of fraud cases to warrant RICO treatment" because the scheme had a "narrow focus," the "main predicate acts here were mail and wire fraud," and there was only one victim, so it was "essentially a dispute between formerly close family friends." *Id.*

In other words, *Al-Abood* did not set up a bright-line rule prohibiting multiple acts of mail or wire fraud from counting separately in a RICO analysis. And the facts of this case are readily distinguishable. This is not a garden-variety private fraud scheme, but a case in which fraud offenses occurred in conjunction with robbery and extortion by those sworn to protect public safety in Baltimore City. It is difficult to imagine a situation posing a greater "special threat to social well-being." The overtime fraud allegations alone involved law enforcement officers claiming to have performed work they did not perform, both jeopardizing public safety and depleting the public fisc for personal gain. In these circumstances, treatment of Mr. Taylor's wire fraud offenses as three separate RICO predicates is entirely appropriate.

Because the three wire fraud acts alone constitute three separate predicate acts, this Court need not reach Mr. Taylor's remaining arguments seeking to undermine the other four predicate racketeering acts. This Court notes, however, that for the reasons discussed above, the predicate

act 5 relating to the robbery of Mr. Stevenson would also remain viable, meaning that the jury found at least five predicate acts where it only needed two.

### 3. *Count Three*

In the Superseding Indictment, Count Three begins by incorporating certain paragraphs of Count One of the indictment describing the Stevenson incident, and then states:

On or about March 22, 2016, in the District of Maryland, the defendants,

WAYNE EARL JENKINS and MARCUS ROOSEVELT TAYLOR

did unlawfully obstruct, delay and affect and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by robbery and extortion as those terms are defined in 18 U.S.C. § 1951, in that the defendants knowingly and unlawfully took and obtained, and attempted to take and obtain, from a person and presence of such person, United States Currency, that is approximately $200,000, against such person's will, by means of actual and threatened force, violence and fear of injury, immediate and future, and with their consent, induced by wrongful use of actual and threatened force, violence and fear, and under color of official right.

ECF 137 at 54. The jury's Count Three verdict specifically found that Mr. Taylor violated the Hobbs Act by committing robbery, not extortion. ECF 342 at 14.

On direct appeal, Mr. Taylor argued that no robbery occurred at Mr. Stevenson's vehicle because all of the seized items were delivered to the BPD's evidence control unit, and that no robbery occurred at his home because nothing was taken there "from the person or in the presence of another." 942 F.3d at 217. In response to those two arguments, the Fourth Circuit affirmed his conviction, stating "we conclude that it was sufficient for the jury to infer that Taylor robbed Stevenson and his passenger, Demetrius Brown, when he took a portion of the cash seized from the van." *Id.* It continued by describing the testimony that the bag in the car had contained $21,500 but only $15,000 had been submitted to evidence control, and reasoned, "[v]iewing this testimony in the light most favorable to the government, we conclude that it would have been reasonable for

a jury to find that there had originally been more than $15,000 in Stevenson's van and that Taylor participated in taking the missing amount from Stevenson and Brown before the remainder was submitted to the evidence control unit. Accordingly, we affirm Taylor's conviction under Count III." *Id.* Having affirmed the conviction on that basis, the Fourth Circuit did not address whether the circumstances at Mr. Stevenson's home also constituted a robbery "from the person or presence of another."

Of course, the Fourth Circuit's affirmance of Mr. Taylor's Hobbs Act robbery conviction would typically constitute law of the case, which must be followed in proceedings under § 2255. *See, e.g.*, *United States v. Treminio-Tobar*, No. 22-6888, 2023 WL 4118574, at *4 (4th Cir. June 22, 2023); *United States v. Fulks*, 683 F.3d 512, 521 (4th Cir. 2012). Mr. Taylor, however, makes a plausible argument that the appellate decision was clearly erroneous because Count Three of the Superseding Indictment expressly charges that the defendants took "approximately $200,000," which was the amount taken from Mr. Stevenson's safe, not the bag in his vehicle. ECF 876 at 18. Thus, affirming Mr. Taylor's Hobbs Act conviction on the sole basis of the alleged $6,500 taken from the vehicle could be erroneous because it might relate to an incident other than the one charged. Nevertheless, this Court concludes that the law-of-the-case doctrine compels this Court's adherence to the decision of the superior appellate court.

A limited exception to the law-of-the-case doctrine applies when the "prior decision was clearly erroneous and would work manifest injustice." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191, 194 (4th Cir. 2009). Even assuming without deciding that the Fourth Circuit's decision was clearly erroneous here, this Court does not find that adhering to the law of the case would work manifest injustice. Mr. Taylor received three identical, concurrent sentences for his three related counts of conviction. *See* ECF 695 at 2. His sentence would therefore remain the same whether he had just

two, or even one, such related counts. For the reasons set forth above, there is no basis to grant post-conviction relief with respect to his convictions for Counts One and Two. Accordingly, this Court does not find that "manifest injustice" would result from an adherence to the Fourth Circuit's binding determination.

Additionally, were this Court to reach the issue that the Fourth Circuit did not address, it would find that the robbery of the money from Mr. Stevenson's home also constituted a robbery "from the person or presence of another," specifically Ms. Holloway. As described above, taking the evidence in the light most favorable to the Government, a reasonable jury could conclude that the officers used force to require Ms. Holloway to remain on the couch while they took steps unlawfully to remove property from her residence. The fact that Ms. Holloway departed while the incident was ongoing is no different from a robbery victim who flees mid-robbery. The robbery, once underway, does not cease to exist when the victim leaves.

### B. Ineffective Assistance Claims

In light of its assessment of Mr. Taylor's insufficient evidence arguments, this Court turns to his ineffective assistance claims.

#### 1. Appellate Counsel

Mr. Taylor's contention that his appellate counsel provided ineffective assistance by failing to raise these legal issues regarding sufficiency of the evidence is unavailing. "Effective assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, and the court must accord counsel the presumption that he decided which issues were most likely to afford relief on appeal." *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (citation omitted). Courts afford appellate counsel "significant latitude to develop a strategy that may omit meritorious claims in order to avoid burying issues in a legal jungle." *Burket v. Angelone*, 208 F.3d

172, 189 (4th Cir. 2000). A petitioner's burden, then, goes well beyond simply identifying a plausible legal issue that appellate counsel did not raise. Instead, the petitioner must show that the "ignored issues are clearly stronger than those presented" in order to overcome "the presumption of effective assistance of counsel." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

On appeal, Mr. Taylor's attorneys raised nine separate appellate issues, including some arguments relating to the insufficiency of the evidence regarding all three counts of conviction. While those arguments ultimately did not succeed, this Court cannot conclude that the "ignored issues" raised by counsel in this § 2255 motion are "clearly stronger than those presented" by his appellate counsel. Because, for the reasons elucidated above, this Court finds no merit to Mr. Taylor's new legal arguments, this Court does not conclude that Mr. Taylor's experienced appellate counsel provided ineffective assistance by failing to raise the issues he now raises in this § 2255 motion.

### 2.   *Trial Counsel*

#### a.   Legal Standard

The seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the standard for constitutionally ineffective assistance of trial counsel. A movant must make a two-pronged showing. The first is that his counsel's performance was "deficient" under prevailing professional norms, 466 U.S. at 687–688. That inquiry involves an assessment of whether the defense attorney acted "strategically," i.e., whether there might be potential downside to pursuing a particular tactic. *Id.* at 690–91. Courts apply a "strong presumption" that a trial counsel's strategy and tactics fall "within the wide range of reasonable professional assistance." *Id.* at 689. If the movant is able to overcome that strong presumption and show deficient performance, he must also show the second

prong, that the deficiency "prejudiced" him. *Id.* at 694. That showing requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

b. <u>Rule 29(c) motion</u>

Mr. Taylor first claims that he received ineffective assistance from his trial counsel because they failed to file a Rule 29(c) motion raising the legal issues he now raises in this motion. Rule 29(c) allows defendants to move the Court to enter judgment of acquittal within seven days of a jury's verdict. Under the relevant standard, the trial court must "determine whether there is substantial evidence to support the verdict when viewed in the light most favorable to the Government." *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Here, for the reasons set forth above, the Government adduced substantial evidence to support the verdict on all three counts, particularly when that evidence is viewed in the light most favorable to the Government. Moreover, it is apparent that a Rule 29(c) motion would have been unavailing, given Judge Blake's denial of two Rule 29(a) motions and her rulings regarding the appropriate jury instructions. Mr. Taylor simply cannot establish a reasonable probability that, had a Rule 29(c) motion been advanced, it would have garnered a different result, particularly given this Court's present evaluation of the merits of his proposed insufficient evidence claims.

c. <u>Eleven issues relating to trial strategy</u>

Mr. Taylor also argues his counsel was ineffective for failing to pursue several points on cross-examination and failing to introduce certain pieces of evidence. Although the intricacies of

17

the issues Mr. Taylor raises vary, they ultimately fall short of the high bar of ineffectiveness for the same reasons: counsels' decisions regarding what evidence to adduce and what lines of cross-examination to pursue are almost always strategic, falling well "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998). Minor points of cross-examination are highly unlikely to meet *Strickland*'s prejudice prong in cases where the evidence is overwhelming. *Walls v. South Carolina Dep't of Corrections*, No. 08-3247, 2009 WL 2423750, at *5 (D.S.C. Aug. 5, 2009).

It is true that the failure to "bring up glaringly obvious grounds for impeachment" or to cross-examine an important witness can evince ineffective assistance. *United States v. Munoz*, 605 F.3d 359, 381 (6th Cir. 2010); *Reynolds v. Giurbino*, 462 F.3d 1099, 1114 (9th Cir. 2006). But counsel are not required to "spot, or … choose to emphasize, *every* basis for undermining" a witness. *Munoz*, 605 F.3d at 381. As the Fourth Circuit has recognized, extensive cross-examination often carries significant risks. *Quesinberry*, 162 F.3d at 279. Decisions by counsel "not to press" issues on cross are often "strategic decision[s] not to risk adverse effects on the defense." *Sterling v. United States*, Crim. No. RDB-06-0179, 2023 WL 588973, at * 3 (D. Md. Feb. 13, 2013) (discussing *Quesinberry*, 162 F.3d). And where the evidence is overwhelming, like in this case, "discrepancies in [a witness's] version[] of events" are likely to be "minor in light of all the evidence against [the defendant]." *Quesinberry*, 162 F.3d at 279 (citing *Strickland*, 266 U.S. at 695). That is, even several non-material points are highly unlikely to raise a reasonable probability that the outcome of the proceeding would have been different. That is especially true where, as here, there was not one star witness, but four separate cooperating witnesses implicating Mr. Taylor.

In *Quesinberry*, for example, the defendant argued that his counsel performed ineffectively for failing to adequately undermine a fact witness's testimony on re-cross. *Id.* at 278. The Fourth Circuit noted that the witness had been extensively cross-examined, and his testimony was consistent with the robust evidence in the case. *Id.* at 278–79. Moreover, a more exhaustive cross-examination could have opened up testimony to further damaging information about the defendant's crimes, and the points counsel did not raise were immaterial. *Id.*

For similar reasons, Mr. Taylor has failed to demonstrate that his counsel's choices on cross-examination, individually or collectively, were objectively deficient, nor that the outcome of his trial would have been different had his counsel made different choices on cross. He cannot overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 694. His specific assertions are addressed below.

### i. Failure to Impeach Mr. Hendrix and Mr. Ward

Mr. Taylor's first argument concerns a video produced by GTTF officers as they opened the safe in Oreese Stevenson's home. Several witnesses at trial—including Mr. Hendrix and Mr. Ward—testified that the video showed a reenactment of the opening of the safe, and that the officers actually removed $100,000 in cash from the safe prior to them recording the video of them supposedly opening it for the first time. Mr. Stevenson confirmed that there was initially $200,000 in the safe, and the video and police paperwork memorialize only $100,000 being seized.

Mr. Taylor now argues that, based on a recent affidavit from an investigator, the video could only have depicted the first opening of the safe. ECF 846 at 58–60; ECF 846-2 at 2–3 (Declaration of Michael McGee). Accordingly, Mr. Taylor argues, his trial counsel erred by failing to challenge Mr. Hendrix and Mr. Ward's testimony that the video was a reenactment, and, "[i]f

trial counsel had effectively cross-examined Hendrix and Ward … it would have so undermined their credibility that the jury likely would have disbelieved their testimony generally." *Id.*

Mr. Taylor has not argued this affiant's opinion (or a similar one) was available to his counsel at the time of trial, nor does he seem to be arguing that failure to find such an opinion was error. ECF 876 at 22 n.7. Rather, he argues that this affidavit demonstrates that there was some possible basis to discredit Mr. Hendrix and Mr. Ward's testimony on this issue, and trial counsel presumably should have discovered and used it against them. Had counsel discovered such an opinion and used it, Mr. Taylor continues, the cooperating witnesses' credibility would have been greatly undermined. The level of extrapolation required to decipher what, exactly, Mr. Taylor thinks his counsel should have done is itself telling.

It is certainly a far leap to suggest that one purported expert's opinion should outweigh the testimony of multiple witnesses who were present when the safe was opened and the video created. The existence of a different opinion—by a person with no firsthand knowledge who does not appear to have any particular background in safes[6]—several years later cannot compel a conclusion that multiple first-hand witnesses were lying. Moreover, Ms. Holloway (who did not testify about the video taken at the safe) also testified that she saw the officers record a video of one officer putting the keys (seized from Mr. Stevenson) in her front door and opening it after they had already been at the house for hours. ECF 468 at 77. That, combined with the consistent testimony of multiple witnesses that the officers created a similar "reenactment" video upon their second opening of the safe, creates a compelling narrative from multiple fact witnesses.

---

[6] The CJA-investigator affiant does not profess to have any specialized knowledge pertaining to safes, but rather underwent a two-week investigation of safes for purposes of this lawsuit.

The question here is whether counsel provided constitutionally deficient performance by failing to raise this video theory with the fact witnesses at trial. Counsel can reasonably decide not to pursue even airtight lines of questioning, and the usefulness of this particular line of impeachment is speculative. It was not necessary for counsel to pursue this somewhat far-fetched theory to perform in an objectively reasonable manner.

Here, though, even (generously) assuming this kind of opinion testimony would have been admissible at trial, it seems unlikely it would have been so much more persuasive than the testimony of multiple fact witnesses that it would have "destroyed" their credibility. There was ample evidence in the record from other witnesses to support the jury's finding that the GTTF officers stole Mr. Stevenson's property. Indeed, there is no serious dispute that the officers took $200,000 dollars from the safe in Mr. Stevenson's basement.

*ii. Other Failures to Impeach Mr. Hendrix*

Mr. Taylor makes two additional arguments regarding lines of impeachment he now believes effective counsel would have pursued with Mr. Hendrix. First, Mr. Taylor argues that his counsel performed deficiently by failing to introduce evidence that contradicted Mr. Hendrix's recollection of the series of events the night the GTTF agents unlawfully searched Mr. Stevenson's home. ECF 846 at 61. And second, Mr. Taylor argues that his counsel performed ineffectively by failing to impeach Mr. Hendrix using past inconsistent statements. *Id.* at 68.

As to the first issue, Mr. Taylor cites BPD records that contradict Mr. Hendrix's recollection of the order in which several events occurred. *Id.* at 63. Mr. Hendrix testified that he did not see the cash seized from Mr. Stevenson's car until after he and the other GTTF officers had searched Mr. Stevenson's home later that evening. ECF 466 at 74–75. BPD records show that Mr. Hendrix submitted the cash into evidence before the "search" of Stevenson's home concluded.

ECF 846-3. The Government suggests that the time listed on the evidence form constituted a clerical error. ECF 872 at 38. Here, curiously, Mr. Taylor's issue is not that his counsel did not challenge Mr. Hendrix's testimony—counsel noted in closing that Mr. Hendrix's account was contradicted by Ms. Holloway's testimony, ECF 475 at 26—but rather that he believes the report would have been a more effective means of challenging Mr. Hendrix's credibility. ECF 846 at 64. This comes down to a strategic decision by counsel about the most effective means of presenting her case. While it is possible that documentary evidence would have been more damaging, counsel did not fall outside of reasonable professional standards in declining to introduce it. Particularly in such a long and complex trial, counsel must make careful choices about what evidence to present the jury in exhibit form. Counsel can reasonably decline to—or even fail to—pursue even viable lines of impeachment based on their professional judgment. *See Walls*, 2009 WL 2423750, at *5.

Mr. Taylor's second argument is similarly unavailing. According to an interview memorandum from May 5, 2017, Mr. Hendrix initially told the Government that upon arriving at Mr. Stevenson's house, Mr. Taylor called out on radio that a child was running out of the back, the detectives chased the child, and the detectives then went into the house to clear it. ECF 846-4. At trial, Mr. Hendrix testified that no one had actually exited the house, and Mr. Taylor had made up the child to justify the officers' presence. ECF 466 at 68–70. Although these statements are not entirely consistent, the Government rightly notes that Mr. Hendrix never claims to have personally seen anyone exit Mr. Stevenson's house. ECF 872 at 39. While it is true that Mr. Taylor's counsel *could* have pursued this line of cross-examination, this is the kind of minor, ultimately non-material point of impeachment that many experienced lawyers would opt not to pursue. There is no requirement that competent counsel pursue every possible point of cross-examination. *Munoz*, 605 F.3d at 381.

In sum, even if counsel could possibly have been *more* effective had they raised these points with the cooperators, not doing so did not render them ineffective. And even had counsel pursued all three points Mr. Taylor raised here, he has not shown that the result would have been different. Like in *Quesinberry*, these points were relatively inconsequential in light of the evidence, and the material points of Mr. Hendrix's testimony were well-corroborated. 162 F.3d at 279.

### iii. Other Failures to Impeach Mr. Ward

Mr. Taylor also raises two additional points he believes his counsel should have raised when cross-examining Mr. Ward. Mr. Taylor first argues his counsel should have impeached Mr. Ward with three prior inconsistent statements. Next, he argues that his counsel should have contradicted Mr. Ward's testimony that Mr. Taylor's then-home had a basement.

First, Mr. Taylor argues that Mr. Ward, too, made inconsistent statements about a person running from Mr. Stevenson's house. According to a 2017 interview memorandum, Mr. Ward initially reported that Mr. Taylor had called out on the radio that someone was running from the back of Mr. Stevenson's house, but that the officers did not catch the person. ECF 846-3 at 14. At trial, like Mr. Hendrix, Mr. Ward testified that no person actually ran from the house, and the officers made it up to feign exigent circumstances to justify warrantless entry. ECF 464 at 145–51. At trial, defense counsel introduced the interview memorandum and cross-examined Mr. Ward about another aspect of it. ECF 465 at 93. Mr. Taylor argues that cross-examination on this "fake person" point would have been more damaging to his credibility. But competent counsel is not required to "spot, or … choose to emphasize, *every* basis for undermining" a witness. *Munoz*, 605 F.3d at 381.

Next, Mr. Taylor notes that in Mr. Ward's interview, he stated that the detectives split funds stolen from Mr. Stevenson in Mr. Ward's basement, ECF 846-4 at 7, not Mr. Taylor's basement.

The Government suggests this is a clerical error, because the same month, Mr. Ward told law enforcement the money had been divided in Mr. Taylor's basement. ECF 846-4 at 16. Regardless, where the officers split the stolen funds is not a material point, and reasonable counsel will often decline to pursue every irrelevant inconsistent statement for purposes of impugning credibility. Moreover, even if this was an oversight, the Constitution does not guarantee perfect counsel, and such a slight oversight would not render counsel deficient. *See Walls*, 2009 WL 2423750, at *5.

Third, Mr. Taylor notes that in Mr. Ward's May 2017 statement to law enforcement he discussed cash found both inside and outside of the safe in Mr. Stevenson's home. ECF 846-3 at 3. At trial, the Government only elicited testimony about the cash inside the safe. ECF 464 at 156–60. Mr. Taylor insists that this amounts to an inconsistent statement. Not quite. Mr. Ward did not say anything at trial that refuted or contradicted his prior testimony; rather, any cash outside of the safe never came up during his testimony. Defense counsel thus had no testimony to impeach him with this prior testimony.

Finally, Mr. Taylor argues that his counsel performed deficiently by failing to challenge Mr. Ward's recollection that the GTTF agents had divided the funds stolen from Mr. Stevenson's home in Mr. Taylor's basement. ECF 846 at 68. Apparently, Mr. Taylor's house at the time did not have a basement, so Mr. Ward's statement, as well as a few statements by the Government, *e.g.*, ECF 137 at 10, were incorrect. The Government provided the whole of Mr. Ward's testimony, in which he clarified that he was referring to "the basement or the lower level" of a "three-story" "townhouse." ECF 353 at 85. There was thus no inconsistency for counsel to have failed to raise.

Even if counsel had pursued these minor points, again, the result of Mr. Taylor's trial would not have been any different in light of the overwhelming evidence. *See Quesinberry*, 162 F.3d at 279.

*iv. Failure to Impeach Mr. Rayam*

Mr. Taylor next argues that his counsel was constitutionally deficient for failing to adequately challenge the testimony of former GTTF officer Mr. Rayam regarding the robbery of Sergio Summerville. At trial, Mr. Rayam testified that he and other GTTF officers (including Mr. Taylor) took a sock containing cash from Mr. Summerville's storage unit, and that he and Mr. Taylor each took some of the money for themselves before returning it to Mr. Summerville. ECF 466 at 214–15. The Government played a recording of a conversation between Mr. Rayam and Mr. Gondo, which Mr. Rayam and the Government (in closing) each described as corroborating Mr. Rayam's testimony that he was obligated to split the funds with Mr. Taylor. ECF 466 at 216; ECF 474 at 116. Defense counsel argued in closing that the recording was "unintelligible," and the jury accordingly should afford it little weight. ECF 475 at 35.

Mr. Taylor now argues his trial counsel acted outside of professional norms by failing to hire an expert to make the recording more intelligible, and thus to discount its usefulness as corroborating evidence and undermine Mr. Rayam's credibility. But the jury heard the actual audio recording and was able to assess whether it (1) was intelligible, and (2) corroborated Mr. Rayam's account of the Summerville robbery. Mr. Taylor's new expert has opined that she did not hear the word "Taylor" in the recording when she enhanced it. ECF 846-6 at 5. Whether or not expert testimony is necessary or helpful is a strategic decision counsel must make. *See Hinton v. Alabama*, 571 U.S. 263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of a strategic choice."); *Harrington v. Richter*, 562 U.S. 86, 106–07 (2011) (noting, where defendant raised ineffectiveness because his lawyer did not hire an expert, that there are "countless ways to provide effective assistance in any given case," and that it was "well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow

a strategy that did not require the use of experts."). Ultimately, Mr. Taylor's counsel prompted the jury to consider the usefulness and intelligibility of the recording after having listened to it. Mr. Taylor has presented no evidence that Mr. Rayam was lying about his recollection of the events. Introducing this expert opinion at trial would not have "destroyed" Mr. Rayam's credibility. Counsel did not perform deficiently by declining to bring in an expert witness to present an alternative view of the recording's content, instead simply arguing could not be ascertained.

Mr. Taylor also argues that his counsel performed deficiently by failing to cross-examine Mr. Rayam about the statement of facts attached to his plea agreement, which did not indicate that he gave Mr. Taylor funds stolen from Mr. Summerville. That the plea agreement—which was only intended to reflect *Mr. Rayam's* conduct—excluded some detail about Mr. Taylor's conduct is not surprising, and the statement of facts contains nothing to contradict Mr. Taylor's involvement. Moreover, every plea agreement in this case includes model language reflecting that the defendant agreed "that it does not represent all the evidence the Government would have produced had the case proceeded to trial." *See, e.g.*, ECF 5 at 15. Chasing down every factual omission in a plea agreement would seem to be far less effective than strategically focusing on Mr. Rayam's cooperation, which is what Mr. Taylor's trial counsel did.

Mr. Taylor has not met his burden to show to his counsel's deficient performance in cross-examining Mr. Rayam. But regardless, Mr. Rayam's testimony was only essential to prove the robbery of Mr. Summerville, which was only one of seven racketeering acts that the jury found proven under Count Two. Thus, the result would not have been different even discounting Mr. Rayam's testimony entirely.

*v. Failure to Impeach Mr. Whiting*

Mr. Taylor next raises two issues he believes his trial counsel should have raised on the cross-examination of Shawn Whiting, a victim. The officers' robbery of Mr. Whiting was one of the seven predicate acts the jury found to support Mr. Taylor's conviction on Count Two. Mr. Whiting had no knowledge whatsoever pertaining to any of the other counts.

Mr. Taylor first argues that his counsel performed deficiently by failing to introduce a prior inconsistent statement from Mr. Whiting identifying a person of a different race than Mr. Taylor as the person who handled money the officers had seized from his closet. ECF 846 at 75–76. The Government rightly notes that both Mr. Whiting and Mr. Ward testified that Mr. Taylor was present during the robbery, and another officer possibly handling the cash does not negate that. ECF 872 at 42. Mr. Taylor noted in his brief that trial counsel "extensively cross-examined Whiting" and that Mr. Whiting had difficulty identifying Mr. Taylor in the courtroom. ECF 846 at 75–76. It is unclear what benefit impeachment with the grand jury testimony Mr. Taylor cites to would have added—the testimony does nothing to contradict that Mr. Taylor was there, and counsel already challenged Mr. Whiting's identification.

Mr. Taylor also takes issue with his trial counsel's handling of the subsequent administrative report Mr. Whiting filed with the BPD. The Government elicited testimony from Mr. Whiting that he had filed a complaint with BPD's Internal Affairs Department ("IAD"), ECF 465 at 183–84, but defense counsel did not introduce evidence at trial that IAD had found Mr. Whiting's complaint unsubstantiated. ECF 846 at 78.[7] That Mr. Whiting's IAD complaint did not lead to any action does not compel a finding that it was based on falsehoods. And IAD, moreover,

---

[7] Mr. Whiting's testimony at trial on this point was not detailed. He merely testified that he called Internal Affairs and told them about his missing money. ECF 465 at 183–84.

had neither the same investigative tools nor the same motivations that federal law enforcement had years later in investigating the GTTF. Mr. Whiting himself had no control over the scope of the IAD investigation or its result. Had counsel sought to introduce this evidence (and had it been allowed), it would have been at best a very minor hit to Mr. Whiting's credibility. Counsel was not constitutionally deficient for declining to pursue this line of cross-examination.

*vi. Failure to Impeach Ms. Holloway*

Mr. Taylor next offers that his counsel performed deficiently by failing to introduce a recorded jail call between Ms. Holloway and Mr. Stevenson, her partner. At trial, Ms. Holloway testified that she had no knowledge of any drugs, drug proceeds, or weapons inside their home, and that she was furious with him when she learned there were drugs and firearms in their home. ECF 468 at 76, 86–90. Mr. Taylor argues that a recorded jail call between Ms. Holloway and Mr. Stevenson would have cast doubt on that testimony and "destroyed" her credibility. ECF 846 at 79. But the call is much more equivocal than Mr. Taylor suggests. At this point, the search had happened, Mr. Stevenson had been arrested, and Ms. Holloway was well-aware of the drugs, firearms, and funds that had been seized. Both Mr. Stevenson and Ms. Holloway expressed that they wished she had beaten the officers to the house. ECF 846 at 79–80. That was it. Their conversation by no means leads to the conclusion that Ms. Holloway was lying in her testimony.[8] Moreover, Mr. Taylor's counsel cross-examined Ms. Holloway about her knowledge of her partner's drug dealing, which achieved the same goal, perhaps more effectively. ECF 468 at 85.

---

[8] Mr. Taylor also suggests the jail call could inform a view that Ms. Holloway sent her son to the house, and that he was the one fleeing from the back, which would undermine the testimony of Mr. Ward and Mr. Hendrix. That is not a natural conclusion. Mr. Stevenson and Ms. Holloway do not mention her son at all, nor sending any other person to the house, on their call. At trial, Ms. Holloway testified that her twelve-year-old son was already home when the officers arrived, ECF 468 at 70, which no one disputes.

*vii. Failure to Introduce Rebuttal Evidence*

Finally, Mr. Taylor contends that his counsel was ineffective for failing to introduce two categories of rebuttal evidence.

First, he argues that his counsel should have introduced evidence that Mr. Taylor received substantial worker's compensation benefits and a $10,000 wire transfer from his parents. ECF 846-2 at 3–4, 846-7. Mr. Taylor had a new deck installed at his home after the 2016 robbery of Mr. Stevenson. ECF 466 at 78. The Government argued that the deck was evidence Mr. Taylor had received stolen funds. ECF 474 at 106. Mr. Taylor argues that it was error not to present an alternative explanation for Mr. Taylor's ability to afford a new deck in 2016. ECF 846 at 82–83. It was not. Mr. Taylor concedes that the new evidence he presents here is not particularly compelling. ECF 872 at 34. Mr. Hendrix testified that Mr. Taylor told him he intended to use stolen funds to pay for a deck. ECF 466 at 78–79. The other payments also seem to have come either years prior to the robbery or months after it. ECF 870 at 44. Like many of the points above, this is the kind of retrospective nitpicking that cannot support a finding of ineffectiveness. The deck was one very small point in the grand scheme of this complex trial, and providing an alternative explanation for its financing would have done little to negate the evidence that Mr. Taylor received stolen funds.

Second, Mr. Taylor points to several pieces of evidence he believes would have raised reasonable doubt as to whether he committed the three acts of wire fraud underlying the jury's verdict on Count Two.[9] They fall into two buckets: first, evidence that Mr. Taylor was working or

_____

[9] That is, Racketeering Acts 17, 20, and 22, which the Jury found in support of its verdict on Count Two. ECF 342 at 13. The Jury also found Racketeering Act 20 in support of its verdict on Count One. *Id.* at 3.

using paid days off during some of the days in question, and second, evidence of a culture of "lackadaisical enforcement" of overtime and vacation policies at BPD. Nobody disputes that Mr. Taylor submitted forms stating he was working on days that he did not, or that he was paid for work he did not do. At trial, the Government's witness testified to data from the third-party timekeeping system BPD used and the overtime slips submitted by GTTF officers. The Fourth Circuit has described the mechanics of the system:

> The evidence shows that the defendants and their coconspirators submitted fraudulent paper timeslips on their own behalf and on behalf of others in the conspiracy, claiming overtime hours for work that they had not performed. These slips were submitted to coconspirator Sgt. Jenkins for approval and to the timekeeper clerk, who entered them into the "eTIME" computer program for processing by ADP, which provided the software and servers for the Police Department's payroll processing. An executive of ADP explained that the Police Department used two of its services — payroll processing on technology known as Enterprise Payroll Services, or EPS, and a timekeeping system called "eTIME." To provide these services, ADP operated a mainframe system with servers located in Sioux Falls, South Dakota. The executive added, "ADP owns the servers and hosts [the products], and the [Police Department] just processes payroll through those servers." He stated that when the Police Department "upload[ed] time and attendance information into this system, [that] create[d] electronic wire communications." Following receipt of the communications in South Dakota, checks were issued or, in "most cases," funds were transferred directly into officers' accounts.

*Taylor*, 942 F.3d at 214–15. Mr. Taylor now argues that his counsel was ineffective for failing to introduce a hodgepodge of internal BPD records, most of which Mr. Taylor cannot currently access.[10] Mr. Taylor has provided an internal roll book that suggests he may have been scheduled

---

[10] Mr. Taylor suggests that arrest records from the dates in question would show that he worked those days. ECF 846 at 85 n.61. It is entirely speculative what those records would say, given that Mr. Taylor has not seen them. Moreover, it is unclear why Mr. Taylor has not provided these records with this Motion. Regardless, Mr. Taylor's theory about these records does not have any factual support at this juncture, and this Court cannot find that his counsel was ineffective for

to have paid time off on some of the dates in question. ECF 486-8. These rolls are not particularly persuasive for several reasons. First, on three of the four relevant days, Mr. Taylor submitted requests for overtime despite not working. On at least two of those dates, he was out of the state or country. The roll thus could only possibly have created doubt as to Racketeering Act 22, the only date in question he did not seek any overtime pay. And second, the rolls were created and signed off on by the same corrupt leadership that orchestrated the time-and-attendance fraud scheme. Four witnesses testified to the pervasiveness of this fraud in the GTTF unit at trial, which included falsifying records. Reasonable counsel, then, might choose not to rely on the questionable internal rolls as a defense.

Finally, Mr. Taylor argues that his counsel performed ineffectively for failing to introduce evidence that BPD had a culture of non-enforcement surrounding time-and-attendance policies. ECF 846 at 86–87. Even under the laxest of policies, most people would not think it even arguably appropriate to submit overtime hours while on vacation out of the country. The argument that "everyone else was doing it" is an unpersuasive defense. Trial counsel was not ineffective for declining to pursue it.

But even if this conduct were ineffective, it caused no prejudice. Mr. Taylor has only raised a plausible argument that the jury's finding as to Racketeering Act 22 could have been different. The jury found seven separate Racketeering Acts under Count 2, and only needed two.

*     *     *

Because Mr. Taylor has cited to numerous smaller issues, the Court will also consider their cumulative effect.

---

declining to request them, particularly in the fact of the robust evidence of time-and-attendance fraud.

Mr. Taylor has retrospectively nitpicked the trial record and found a number of places where some competent lawyers could have made different choices. He has found a handful of lines of questioning his trial counsel could have pursued, and a smattering of evidence they could have introduced. Ultimately, though, he has not painted a picture of deficient or incompetent counsel, but rather counsel faced with difficult strategic choices in a lengthy and complex trial. Each issue Mr. Taylor now raises carried a potential downside, and his counsel acted within professional bounds in weighing the risks and rewards of various approaches. *Strickland*, 466 U.S. at 690–91. But even if every one of these issues was an oversight, and not an intentional choice, his counsel was not ineffective: most of them amount to minor, or even irrelevant, points. Considered holistically, Mr. Taylor has not demonstrated that his counsel was deficient, nor that there is a reasonable probability the outcome of his trial would have been different had his counsel pursued the eleven issues he raises here.

d.    <u>Objection to the closing argument</u>

Finally, Mr. Taylor argues that his counsel performed ineffectively by failing to raise two issues related to who properly qualified as the victim of the robbery of Oreese Stevenson. Mr. Taylor first argues that his counsel should have objected to the Government's closing, because the Government argued that the jury could find Mr. Taylor guilty of Racketeering Act Eight and Count Three based on the robbery of Ms. Holloway. Second, Mr. Taylor argues his counsel was ineffective for failing to request a jury instruction that Mr. Taylor could only be found guilty of Racketeering Act Eight and Count Three if it also found that Mr. Stevenson had a legal interest in the money taken during the traffic stop.

Neither of these legal arguments is persuasive. The Fourth Circuit has already rejected Mr. Taylor's second argument. *See Taylor*, 942 F.3d at 217 ("[W]e conclude that it was sufficient for

the jury to infer that Taylor robbed Stevenson and his passenger, Demetrius Brown, when he took a portion of the cash seized from the van."). And as this Court discussed at *supra* pages 10–11, if it were to reach the issue, it would find that the robbery of the money from Mr. Stevenson's home constituted a robbery of Ms. Holloway. The jury could have found Ms. Holloway to be a victim. Counsel did not err in either respect, nor is it reasonably likely that these issues, if raised, would have led to a different outcome.

## IV.    DUE PROCESS VIOLATION

In addition, Mr. Taylor has sought leave to amend his motion to add a due process claim stemming from his allegations that the Government suborned perjury at his trial. ECF 882. Mr. Taylor initially requested an extension of his statute of limitations, expired on October 10, 2024, to file this claim after the evidentiary hearing he requested in his initial motion. ECF 877. That request is now moot, as Mr. Taylor has filed his due process claim prior to the expiration of his stature of limitations and because no evidentiary hearing is needed. The Government has opposed Mr. Taylor's motion for leave to amend, ECF 884, and Mr. Taylor filed a reply memorandum, ECF 885. Because Mr. Taylor's due process claim is substantially related to his previously raised ineffective-assistance-of-counsel claims, this Court will grant his motion for leave to amend, ECF 882, and will consider his perjury claim.

### A.    Procedural Default

The Government rightly notes that this new claim is procedurally defaulted. As the Fourth Circuit has explained, district courts generally may not consider the merits of § 2255 claims if they were not raised on direct appeal. *Mikalajunas*, 186 F.3d at 492. There are only two exceptions: where the petitioner can show cause that excuses his failure to raise the issue on direct appeal, and actual prejudice resulting from the errors; or where "a miscarriage of justice would result from the refusal of the court to entertain the collateral attack." *Id.* at 492–93. Mr. Taylor does not appear to

make any argument rooted in cause and prejudice, but rather seems to rely on his previous actual innocence argument, which this Court has already rejected. *See supra* pages 3–5. Moreover, if a petitioner seeks to rely on actual innocence to overcome the doctrine of procedural default, he must "support his allegations of constitutional error with *new* reliable evidence—whether it be exculpatory scientific evidence, eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324 (emphasis added). In support of his claims, Mr. Taylor cites to three cooperating witnesses' plea agreements and a brief excerpt from a book authored by AUSA Leo Wise about the GTTF investigation and trial. The plea agreements are not new—trial counsel had them at the time of trial. And Mr. Wise's book contains no new evidence about prosecutorial misconduct or perjured testimony; rather, it describes what happened during the investigation and trial of this case from his perspective. The portion Mr. Taylor now cites[11] to is a description, based on evidence obtained through the U.S. Attorney's Office's investigation, of what happened the night the officers robbed Mr. Stevenson. It contains no new, reliable evidence. Mr. Wise was not an eyewitness to the events and his summary is not "new, reliable evidence" of the type contemplated by *Schlup*.

Mr. Taylor has not convincingly rebutted the Government's claim of procedural default. Although he cites a number of cases in support of his view, all of those cases involve actual collateral constitutional challenges—*e.g.*, ineffective-assistance-of-counsel or *Brady* claims. Those kinds of claims inherently involve factfinding beyond the scope of the trial record, which is

---

[11] The cited portion reads as follows: "On March 22, around 5:30pm, Holloway's older son called her at work. He had been waiting for her on the porch at home, but now someone else was at the house. She left work immediately and headed to Heathfield. On the way, she called her mother-in-law and asked her to go there, too. When she arrived thirty minutes later, two police officers were sitting in her living room. She identified Taylor and Ward from pictures we showed her." Leo Wise, *Who Speaks for You?: The Inside Story of the Prosecutor Who Took Down Baltimore's Most Crooked Cops* 81 (2023).

in part why they are best handled in the first instance by district courts. *Cf. Rigas v. United States*, No. 11-CVF-6964, 2015 WL 3403861, at *13 (S.D.N.Y. May 15, 2015). It is possible in some circumstances that a perjury claim could fit a similar mold, but this one does not. This claim merely repackages evidentiary claims based on long-existing evidence and suggests that they might also support an inference of prosecutorial misconduct. But Mr. Taylor has not raised any evidence that misconduct occurred, much less any new, reliable evidence that fell beyond the scope of the trial record. This claim could have been fully presented and fairly considered on direct appeal, and Mr. Taylor has not presented a reason for this Court to excuse his default.

      B.    <u>Merits</u>

But even if Mr. Taylor could overcome the hurdle of procedural default, his Constitutional claims would fail on the merits. Mr. Taylor's Constitutional claims follow a pattern familiar from his evidentiary claims: he notes pieces of testimony that are not identical, but are also not contradictory, and insists that they evince perjury. Minor inconsistencies do not compel a finding that someone lied. To prevail on a claim that the Government suborned perjury, Mr. Taylor must demonstrate that "(1) the testimony was false; (2) the Government knew the testimony was false; and (3) there is a reasonable possibility that the false testimony could have affected the verdict." *United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2004) (citations omitted).

Here, he has not shown that there was false testimony. This Court has already discussed at length, and ultimately rejected, Mr. Taylor's assertion that Mr. Hendrix and Mr. Ward committed perjury by giving very slightly different accounts of their justification for entering Mr. Stevenson's house the night they robbed him. Mr. Taylor now seeks to supplement that assertion with Mr. Jenkins's plea agreement and Mr. Wise's book, which he claims underscore his view that there actually was a young man at Mr. Stevenson's home the night of the robbery. ECF 882 at 12–13.

But Mr. Taylor has not created any inconsistency, much less one that evidences perjury. Mr. Ward testified that Mr. Jenkins instructed Mr. Taylor to pretend someone was exiting the Holloway/Stevenson home to create a false impression of exigent circumstances. ECF 353 at 67. He said that he did not know of any person in the back of the house. ECF 354 at 90. Mr. Hendrix similarly testified that Mr. Jenkins instructed Mr. Taylor to pretend to be chasing someone who was running from the back of the house, and that to his knowledge, there was not a real person running from the house. ECF 355 at 42; *id.* at 87–89. None of that is inconsistent with considerable testimony, the statement in the plea agreement, or the statement in Mr. Wise's book that Mr. Stevenson and Ms. Holloway's son was home at some point that day. The jury was presented with those two, non-conflicting facts. No one ever suggested that Mr. Taylor chased the son. Because both of these accounts could be true, and none of the testimony directly conflicts, Mr. Taylor has failed to demonstrate that there was any false testimony. In the absence of any evidenced false testimony, it is impossible for the Government to have known or had reason to know of the falsity.

Mr. Taylor's continued fixation on this point does not render it more material—the evidence that the officers robbed Mr. Stevenson's home is overwhelming, and whether there really was a "ruse" about the fleeing person has no bearing on that. Courts in this Circuit "have consistently found alleged perjury harmless when substantial corroborating evidence gave the jury ample grounds to convict." *Byers v. United States*, No. RDB-08-556, 2022 WL 17850122, at *8 (D. Md. Dec. 22, 2022); *Roane*, 378 F.3d 382 (rejecting perjury claim where witness was incarcerated at the time he allegedly identified defendants as gang members, because evidence of gang membership was otherwise overwhelming). Even if Mr. Taylor could demonstrate that there was false testimony from one or more cooperators on this point, there is not any reasonable

possibility that this small issue had any impact on the verdict. *See Kyles v. Whitely*, 514 U.S. 419, 433 n.7 (1995).

## V.     CONCLUSION

For the reasons described herein, Mr. Taylor's § 2255 Motion must be DENIED. Because this Court's assessment of whether there has been a denial of Mr. Taylor's constitutional rights turns, in some part, on deference to the Fourth Circuit's ruling on Mr. Taylor's direct appeal, this Court deems it appropriate to issue a certificate of appealability to allow the Fourth Circuit an opportunity to consider the argument that it committed clear error. *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right."); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (describing the "substantial showing" standard).

A separate Order follows.


Date:   October 15, 2024

                                                          /s/
                                                  Stephanie A. Gallagher
                                                  U.S. District Court Judge